SAGE STREET ASSOCIATES, 3525 Sage Street Associates, and Marvin B. Myers, Petitioners,

v.

NORTHDALE CONSTRUCTION COMPANY, Robert B. Evans, and Federal Insurance Company, Respondents.

No. D–1349.

Supreme Court of Texas.

June 30, 1993.

Dissenting Opinion of Justice Hecht Nov. 24, 1993.

Rehearing Overruled Nov. 24, 1993.

David T. Harvin, Betty R. Owens, Scott Burdine, Gregory Neill Jones, Houston, for petitioners.

Michael C. Gridley, Geoffrey H. Bracken, Maxwell Evans, William Coats, Richard F. Greenleaf, W. James Kronzer, Jr., Leslie C. Taylor, David M. Gunn, Yocel Alonso, Houston, for respondents.

## OPINION

DOGGETT, Justice.

This construction contract dispute involves multiple issues regarding damages under the agreement and whether the anti-usury provision of the Texas Constitution, article XVI, section 11, applies to the rate of judicially ordered prejudgment interest.

### I.

In a judgment awarding Northdale Construction Company damages against Sage Street Associates arising from breach of a construction contract, the trial court provided for six percent (6%) prejudgment interest. In its affirmance, the court of appeals reformed the judgment to reflect prejudgment interest of ten percent (10%). 809 S.W.2d 775, 778 (1991). Sage Street contests the reformation, asserting that the Texas Constitution limits the rate to six percent (6%). We affirm.

In *Edgewood Indep. School Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex.1989) (*Edgewood I* ), we set forth the appropriate methodology for construing constitutional language:

> [W]e consider the intent of the people who adopted it. In determining that intent, the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of inquiry. However, because of the difficulties

inherent in determining the intent of voters over a century ago, we rely heavily on the literal text. We seek its meaning with the understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time.

(citations omitted). *See also Davenport v. Garcia*, 834 S.W.2d 4, 19 (Tex.1992); *Damon v. Cornett*, 781 S.W.2d 597, 599 (Tex.1989). The history of article XVI, section 11 of the Texas Constitution reflects a concern for effective regulation of commercial lending and does not contemplate a judicial award of prejudgment interest. Laws prohibiting usury had been abolished by article XII, section 44 of the Constitution of 1869, resulting in a period of credit abuse. The 1876 Constitution was a response to that problem. *See* Tex. Const. art. XVI, § 11, interp. commentary at 36 (Vernon 1993); *Allee v. Benser*, 779 S.W.2d 61, 62–63 (Tex.1988); 2 George D. Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 729 (1977). As originally enacted, it forcefully required that:

> The legal rate of interest shall not exceed eight per cent. per annum, in the absence of *any contract as to the rate of interest;* and by contract parties may agree upon any rate not to exceed twelve per cent. per annum. All interest charged above this last named rate, shall be deemed usurious, and the Legislature shall, at its first session, provide appropriate pains and penalties to prevent and punish usury.

Tex. Const., art. XVI, § 11 (1876) (emphasis added).[1] By amendment in 1891, the section was rearranged and the rates were lowered:

> *All contracts for a greater rate of interest than ten per centum per annum, shall be deemed usurious* ... but when no rate of interest is agreed upon, the rate shall not exceed six per centum per annum.

Tex. Const., art. XVI, § 11 (as amended Aug. 11, 1891) (emphasis added).

---

1. During the Constitutional Convention of 1875, this provision was referred to as "the section which provides for usury laws." *Galveston Daily* *News*, Nov. 17, 1875, p. 1, col. 4. There is no indication that the framers intended the section to govern anything but commercial usury.

In 1960, to enable the Legislature to classify and license lenders and to define usury,[2] this section was amended to read as follows:

> The Legislature shall have authority to classify *loans and lenders,* license and regulate *lenders,* define interest and fix maximum rates of interest; provided, however, in the absence of legislation fixing maximum rates of interest *all contracts for* a greater rate of *interest* than ten per centum (10%) per annum shall be deemed usurious; provided, further that in contracts where no rate of interest is agreed upon, the rate shall not exceed six per centum (6%) per annum. . . .

Tex. Const., art. XVI, § 11 (as amended Nov. 8, 1960) (emphasis added). In this more lengthy amended version, the drafters apparently found it necessary to repeat the word "contracts" for clarity in referring back to the specific clause "contracts for . . . interest."

Sage Street claims that the phrase "in contracts where no rate of interest is agreed upon, the rate shall not exceed six percent" restricts the power of a court in setting the level of prejudgment interest. In considering the literal text and its historical development, we cannot take words out of context. The plain language of section 11 indicates that it applies solely to "contracts for . . . interest."

This court has previously held that a necessary element of usury is an overcharge by a lender. *Crow v. Home Sav. Ass'n of Dallas County,* 522 S.W.2d 457, 459–60 (Tex. 1975). There we concluded:

> It is a fundamental principle governing the law of usury that it must be founded on a loan or forbearance of money; if neither of these elements exist, there can be no usury.

*Id.* at 459. Referring to article XVI, section 11 and the legislation enacted thereunder, we reiterated this requirement in *Stedman v.*

*Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 489 (Tex.1979). When we have previously found the existence of usury, it has resulted from a transaction between parties, not between a party and a court. There is a significant difference between the interest *charged* by one who *consensually* agrees to part with money and the interest *awarded* by a court to a party *wrongfully* denied its money as a result of a breach of contract.

The rate of prejudgment interest challenged here resulted not from a contract but from the act of a judge. In holding that a demand for interest in a pleading does not constitute a usurious charge, this court has contrasted the nature and purpose of anti-usury laws with the function of prejudgment interest. *George A. Fuller Co. v. Carpet Serv.,* 823 S.W.2d 603 (Tex.1992). Unlike the "abusive practices in consumer and commercial credit transactions" that such statutes are "designed to correct," prejudgment interest "compensate[s] a plaintiff for the delay between [an] injury and the payment for that injury." *Id.* at 605.

Northdale Construction Company did not engage in any transaction that charged interest to Sage Street. The rate of interest at issue here was derived solely "from the judicial process rather than directly from a commercial or consumer transaction." *Id.* This prejudgment interest was "obtained [exclusively] by court order." *Id.* What has been said so recently of "[p]leadings that allege prejudgment interest," remains true today regarding the rate of that interest—this subject is "best dealt with in the context of the judicial process . . . rather than through the Texas usury laws." *Id.*

■ Because its language governs only lending and credit transactions, we hold that article XVI, section 11 is inapplicable to the rate of prejudgment interest set by a court.[3]

---

2. Although the Legislature has, since 1960, been accorded "greater flexibility in defining usury and in classifying lenders," *Wagner v. Austin Sav. & Loan Ass'n,* 525 S.W.2d 724, 728 (Tex.Civ. App.—Beaumont 1975, no writ), it has never sought to expand the statutory definition of usury to encompass prejudgment interest.

3. We disapprove the contrary holding in *Olson v. Bayland Publishing Inc.,* 781 S.W.2d 659 (Tex. App.—Houston [1st Dist.] 1989, writ denied).

## II.

Sage Street makes a number of complaints regarding assessment of damages and liability under the contract by both the trial court and court of appeals. The evidence, viewed in the most favorable light to the jury verdict, reveals that as the owner of property in southwest Houston, Sage Street through its general partner Marvin B. Myers wished to build a high-rise apartment building for which financing from the Department of Housing and Urban Development (HUD) was apparently available, if the construction price did not exceed $13.5 million. In January 1984, Myers negotiated with Northdale's president Robert B. Evans and offered to guarantee Northdale a $760,000 anticipated profit from the job if Northdale would sign a contract with a nominal price of $13.5 million. Evans asked what would happen if costs on the project ran higher than $13.5 million, even as high as $19 million. Myers explained that because Northdale's fee was "sacred," it would still receive the cost of the work plus a $760,000 fee. He also indicated that after HUD approval at the $13.5 million base price, the project could be expanded and the price increased through change orders.[4]

On March 7, 1984, Northdale and Sage Street entered into a Construction Agreement containing the following payment provisions:

> Notwithstanding anything to the contrary contained in this document, or in any other document signed by the parties, either before or after the date of this document, except for changes in the Work requested by [Sage Street] or Supervising Architect, which are approved by Mortgagee and HUD ..., [Sage Street] shall pay [Northdale] for the Work an amount equal to the smaller of THIRTEEN MILLION FIVE HUNDRED THIRTY–FIVE THOUSAND AND NO/100 DOLLARS ($13,535,000.00) as adjusted pursuant to Exhibit C, or the amount of Work cost certified to HUD and approved by HUD with regard to the Project.

Anything to the contrary contained herein or in the cost plus construction contract FHA Form 2442A notwithstanding, it is specifically agreed that [Northdale] and its affiliates shall be entitled to and shall receive from [Sage Street] the following profit and overhead, totaling SEVEN HUNDRED AND SIXTY THOUSAND DOLLARS ($760,000.00), without regard to costs whether actual or certified, approved, or disapproved, as follows:

> (i) [Northdale] shall receive an overhead allowance of TWO HUNDRED AND SIXTY ONE THOUSAND ONE HUNDRED AND FIFTY NINE DOLLARS ($261,159.00), to be drawn over the construction period, pro rata; and

> (ii) an aggregate of FOUR HUNDRED AND NINETY EIGHT THOUSAND EIGHT HUNDRED AND FORTY ONE DOLLARS ($498,841.00) shall be included in the categories of profit and overhead in subcontracts with affiliates of the Contractor for concrete and carpentry work.

This contract authorized monthly payment requests by Northdale for work performed. Sage Street was to pay in each installment only for 90% of the work done, until the overall project was 90% complete, at which point Sage Street was to "cooperate with [Northdale] in obtaining HUD ... approval to reduce the retention to five percent."

Approximately three weeks later, in an action that Myers told Evans was "strictly to accommodate HUD," Sage Street and Northdale executed a second contract (HUD contract), referred to in the payment provisions quoted above as "cost plus construction contract FHA Form 2442A." The HUD contract provided that Sage Street would pay to Northdale the actual cost of construction as defined therein, plus a fee of "$ NONE," and that in no event would the total amount payable exceed $13,535,000. The HUD Contract did not refer to the earlier contract, and

---

4. We are not able today to address the questionable propriety of the contract's financing arrangement, which used a Department of Housing and Urban Development funding program designed for construction of low to moderate income housing to build a luxury high-rise condominium. By agreement of the parties, the trial judge instructed the jury not to consider "the legality of the HUD financing of the project."

indeed provided that it constituted the entire agreement between the parties.[5]

During the course of construction, various disputes arose between Sage Street and Northdale, primarily over how payments for design changes and extra work were to be handled. In September 1985, Northdale stopped or sharply reduced work on certain extra items for which it had not received payment. In November 1985, when the project was approximately 90% complete, and after receiving somewhat more than $11 million, Northdale stopped work and was terminated as contractor by Sage Street. Sage Street hired Cahaba Construction Company to finish the project.

Northdale and Sage Street filed separate suits that were consolidated for trial. The jury found that Sage Street had wrongfully terminated Northdale and that Northdale was owed $2,491,110 "pursuant to the contract for the work it performed, its overhead, and its profit, if any." The court of appeals affirmed this award, concluding that for Northdale to be put in the position it would have occupied had it been allowed to complete the contract, Northdale "should receive the contract price minus the money it had received, plus any amounts owed for utilities and spent on change orders." 809 S.W.2d at 778 (1991). Because the evidence showed that change orders increased the contract price to $13,863,900, or $2,760,696 more than the court of appeals concluded Northdale was paid, and because there was testimony that Northdale was owed $53,401 in reimbursements for utility bills, the court of appeals concluded that the evidence would support any award up to the sum of these, or $2,814,097. *Id.*

Sage Street challenges this determination on multiple grounds. We overrule its initial no evidence challenge to the jury's finding of wrongful termination of Northdale, an issue which was vigorously disputed at trial with each side producing evidence for its version of the conflict. Its next no evidence attack on damages, alleging Northdale's failure to prove the cost of completion, is more complex. Alternatively, Sage Street contends that it presented conclusive evidence demonstrating that its completion costs were almost $2.9 million, which, because the jury assessed damages of only $2.4 million, would mean that Northdale really suffered no damages. These two arguments present slightly different considerations and must be addressed separately.

The first argument, focusing on Northdale's failure to offer evidence of the cost to complete, assumes that proving completion cost is part of the terminated contractor's burden, as is true in cases involving a fixed-price contract. *See Farris v. Smith Erectors, Inc.,* 516 S.W.2d 281, 283–84 (Tex. Civ.App.—Houston [1st Dist.] 1974, no writ) ("burden of proof is upon the contractor to provide the data from which such damages may be computed [which] would consist of evidence of the contract price and proof of the probable cost to the plaintiff of completing performance.") (citations omitted). Such reasoning is, however, inapplicable to a cost-plus contract, because lost profits are not dependent in the same way on completion cost. The builder's profit from such a contract is either a contractually defined percentage of costs or, as in this case, a flat fee added to costs; it is not the difference between costs and a contractually fixed price. Accordingly, the plaintiff's burden in suing on a cost-plus contract is only to prove the contract, the breach, and the total reimbursable costs. *See Burditt v. Sisk,* 710 S.W.2d 114, 118 (Tex.App.—Corpus Christi 1986, no writ); *Lee v. Ardoin,* 677 S.W.2d 686, 688–89 (Tex.App.—Beaumont 1984, no writ).[6] Here

---

5. The parties agree, and the jury was instructed, that the Construction Agreement and the HUD Contract both governed the work and together constituted the parties' agreement. The two contracts seemingly conflict as to whether Northdale was to be paid for its certified costs up to $13,535,000, plus a flat fee of $760,000 (Construction Agreement), or whether Northdale was simply to receive its costs up to $13,535,000 (HUD contract). In either case, though, the parties' agreement was on a "cost-plus" rather than "fixed-price" basis.

6. An issue as to completion cost might arise under a cost-plus contract where profit was a percentage of allowable costs rather than a flat fee, if the plaintiff sought to base his profit recovery on the total costs that he would ultimately have incurred, rather than on the costs incurred during partial performance. Because the agree-

a further complication is presented by the contractual ceiling on reimbursable costs. Arguably, Northdale should have had the burden of proving that all costs incurred before termination would actually have been reimbursable upon contract completion, *i.e.*, that the total costs of performance would not have exceeded the cap of $13,535,000. To place Northdale in the position it would have occupied upon contract completion, its recovery must allegedly be further reduced by cost overruns that would have reduced the profit.

■ We hold that, where the owner is responsible for the contractor's incomplete performance under a cost-plus contract, proof that the cost ceiling would have been met is not part of the contractor's *prima facie* case. Since this is in the nature of a claimed credit to which the owner must prove his entitlement,[7] Northdale's failure to offer evidence of completion cost does not bar recovery.[8]

■ Sage Street's second argument relies on its proof of Northdale's likely completion cost. Civil engineer James Gribble testified at trial that, even excluding expenses which he deemed not within the scope of Northdale's contract, Sage Street had spent $2,881,520 to finish the work contracted to Northdale. Sage Street contends that because this number exceeds the $2,814,097 to which the court of appeals found Northdale would have been entitled, Northdale suffered no damages. This argument erroneously assumes that Gribble's estimate must be accepted as conclusive evidence of Northdale's cost to complete. Even if it was uncontradicted, the jury need not have accepted this testimony and could well have concluded that Cahaba's start-up costs including the time and effort necessary for it to become acquainted with the project caused Sage Street's expenditures to exceed Northdale's likely completion cost.[9]

Sage Street next contends that in addition to paying Northdale slightly over $11 million, it also paid the 10% retainage of approximately $1.2 million directly to Northdale's subcontractors after it had terminated Northdale. Sage Street argues that because Northdale owed these subcontractors this amount, it should have these sums credited against its recovery. Northdale correctly responds that Sage Street has waived this argument by failing both to plead or submit it to the jury, as required by Rule 95, Texas Rules of Civil Procedure:

> When a defendant shall desire to prove payment, he shall file with his plea an account stating distinctly the nature of such payment, and the several items thereof; failing to do so, he shall not be allowed to prove the same, unless it be so plainly and particularly described in the plea as to give the plaintiff full notice of the character thereof.

The generality of Sage Street's pleading regarding "[p]ayments to subcontractors and

---

ment here provided for a flat $760,000 fee (if any), no such issue is presented.

7. By contrast, it has been held that when a contractor seeks to recover on a theory of substantial performance, the contractor bears the burden of proving the appropriate credit due to the owner for defects and omissions. *See Atkinson v. Jackson Bros.*, 270 S.W. 848, 851 (Tex. Comm'n App.1925, holding approved); *Graham Constr. Co. v. Robert H. Pyle, Inc.*, 422 S.W.2d 485, 487 (Tex.Civ.App.—Corpus Christi 1967, writ ref'd n.r.e.); *Pacific Coast Eng'g Co. v. Trinity Constr. Co.*, 410 S.W.2d 797, 800 (Tex.Civ. App.—Waco 1967, writ ref'd n.r.e.).

8. In making this argument, Sage Street relies also on a provision of the Construction Agreement requiring that Northdale's requests for payment be accompanied by documentation to certify that "funds reserved for [Northdale] are adequate to fully pay for all of the remaining Work through completion of the Project." Sage Street argues that because of this provision, awarding any amount to Northdale without proof of completion cost is contrary to the contract's terms.

This argument is unpersuasive. The quoted provision potentially affected the rate at which Northdale was to be paid during execution of the contract. It does not bind a court or jury in determining, after breach, how much Northdale would ultimately have received by performing.

9. The jury was neither asked to make a separate determination of completion cost nor instructed that it should consider completion cost in calculating Northdale's damages. Sage Street's argument goes only to whether, in calculating the "profit, if any," the jury improperly ignored conclusive evidence showing that Northdale would have realized no profit.

suppliers, which monies had already been paid to Northdale," fails to satisfy this rule; furthermore, it does not match Sage Street's contention here that *retained* sums, *i.e.*, those it had *not* paid Northdale, were paid to subcontractors.

In their briefs here, the parties contest whether the payments to the subcontractors were entirely for obligations incurred by Northdale before termination, or were also for post-termination work performed by the subcontractors in completing the project. Sage Street points to nothing in the record to resolve this question.[10]

### III.

Sage Street's next contention is that the Construction Agreement unambiguously provided that the $13,535,000 maximum contract price included Northdale's $760,000 fee, and that inclusion of that fee in the damages improperly allows Northdale a double recovery. Sage Street asserts that the Construction Agreement demonstrates that the fee was to be realized through an overhead allowance of $261,159 and through the inclusion of $498,841 in a subcontract with a Northdale affiliate. There was testimony at trial that Northdale agreed to this method of receiving its profit so as to comply with HUD limitations on profit and overhead.[11] Sage Street indicates that the Construction Agreement required it to pay the smaller of the certified cost or $13,535,000, for "the Work," which was contractually defined to encompass the concrete and carpentry work.

Sage Street also points to the HUD Contract, which specifically states that Northdale shall receive a fee of "NONE" in addition to the actual cost of construction, with the total payment in no event to exceed $13,535,000. Article 10 of the HUD contract defines actual cost of construction to include the general overhead contained on the attached contrac-

tor's cost breakdown, which shows an allowance of $261,159 for builder's overhead included *within* the $13,535,000 total cost. The only way to harmonize the Construction Agreement with the HUD Contract, Sage Street argues, is to read the $760,000 fee described in the Construction Agreement as part of the $13,535,000 price ceiling.

Although never pleading ambiguity at the trial court, Northdale now contends the agreements are ambiguous on this issue by referencing the Construction Agreement's provision for Northdale to be paid a $760,000 fee "without regard to costs whether actual or certified, approved, or disapproved." Sage Street argues that this language was intended to protect Northdale against any refusal by HUD to approve and certify all costs of the work. In other words, even if HUD rejected some of the costs, Sage Street would ensure that Northdale was paid the $760,000 allotted to overhead and to profit in the concrete and carpentry subcontract. Myers testified at trial that the provision also served to ensure the profit even if Northdale brought the job in at a cost lower than $13,535,000. Since HUD regulations limit a contractor's allowable profit to a percentage of the costs, performing a job efficiently and at a lower cost could reduce the contractor's profit absent such a contractual provision.

Because neither party pled that the contract was ambiguous, Sage Street contends that its proper construction must be a question of law for this court. Northdale responds by arguing that a failure to plead an ambiguity cannot resolve an otherwise ambiguous contract construction, and that if this contract is ambiguous, the factual question of the parties' intent was tried by consent and must be deemed either to have been subsumed within the jury's answer to the damages question or to have been the subject of an implied finding by the trial court to

---

**10.** Myers asserted in response to a question inquiring whether he was holding $1.2 million in retainage due to Northdale: "I'm holding—no, that's all been spent and given to subcontractors and the people that finished the work and built it."

However, Sage Street refers us to nothing in the record verifying these payments or detailing the work that they covered.

**11.** The Construction Agreement further stated "[i]t is contemplated that the profit and overhead to be included in the concrete and carpentry subcontracts shall be within the percentages of permissible profit and overhead allowed by HUD and all other appropriate federal agencies or authorities."

support the judgment. *See* Tex.R.Civ.P. 67, 90, 279. Deciding whether a contract is ambiguous is a question of law for the court. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex. 1983); *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex. 1980). A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *See Coker,* 650 S.W.2d at 393; *see also White v. Moore,* 760 S.W.2d 242, 243 (Tex.1988). However, because both *Coker* and *White* involved appeals from summary judgments, they do not resolve what effect the jury verdict should have in this case.

We hold that the contracts are ambiguous as to whether the $760,000 fee was owed Northdale independently of the $13,535,000 maximum price. Looking at the two contracts as a whole on the question of the $760,000 fee, we conclude that the agreement is "reasonably susceptible [of] more than one meaning." *Coker,* 650 S.W.2d at 393. The HUD Contract and attached cost breakdown at least create some reasonable basis for Sage Street's view. Indeed, by itself the HUD Contract unambiguously includes amounts designated as profit in the Construction Agreement within the $13,535,000 maximum contract price. The Construction Agreement suggests a contrary proposition. To treat the $760,000 fee as merely another component of the $13,535,000 package, which would be swallowed up to the extent that Northdale's costs on other items exceeded $12,775,000, fails to give effect to that Agreement's description of this sum as "profit" to be received "without regard to costs whether actual or certified, approved or disapproved."

Sage Street's argument that we must read the Construction Agreement provisions in harmony with the clearer statements in the HUD contract also fails to render the agreement unambiguous, because both documents contain provisions purporting to override the other. The HUD contract states:

This Contract constitutes the entire agreement between the parties, and any previously existing contract concerning the

work contemplated by the Contract Documents is hereby revoked.

However, the Construction Agreement, in the very paragraph under dispute, expressly attempts to supersede the HUD contract by declaring "[a]nything to the contrary contained herein or in the cost plus construction contract FHA form 2242A notwithstanding...."

■ Here, although it was not pled by either party, the trial court appropriately submitted this ambiguity to the jury because it was tried by consent of the parties. *See* Tex.R.Civ.P. 67.[12] Several Texas courts have held that the question of a contract's meaning was tried by implied consent despite the absence of a pleading of ambiguity. In *Chambless v. J.J. Fritch, General Contractor, Inc.,* 336 S.W.2d 200 (Tex.Civ.App.—Dallas 1960, writ ref'd n.r.e.), a subcontractor sued a general contractor over the scope of his contractual obligation to paint "unfinished spaces" of the construction project. The court of appeals affirmed the trial court's take-nothing judgment in a bench trial, finding sufficient evidence to support the implied finding that "unfinished spaces" included the areas in dispute. The court noted that because testimony on the meaning of "unfinished spaces" was received from both sides without objection, "[t]o us it seems quite plain that the case was tried as if ambiguity had been pled." *Id.* at 203; *see also Gulf & Basco Co. v. Buchanan,* 707 S.W.2d 655, 656–57 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (sustaining trial court's express holding of ambiguity and finding of proper construction, where neither party pled ambiguity but the question of the contract's meaning "was clearly brought before the court not only by consent, but also by the active assistance of both parties").

The same reasoning applies here. Several witnesses, including Evans, Myers, and Gribble, testified as to their interpretation of the contract regarding the $760,000 fee. It is clear from the record that both sides vigorously advanced their respective positions at trial.

12. Because we hold that ambiguity was tried by consent, we need not address what action a court should take when faced with an ambiguous con- tract in a case in which the issue was neither pled nor effectively tried by implied consent.

Sage Street contends that this testimony cannot constitute trial of the contract's meaning by implied consent because the doctrine generally should not apply if the evidence said to support the issue is relevant to other issues raised by the pleadings. *See, e.g., Praeger v. Wilson,* 721 S.W.2d 597, 603 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.); *Wendell v. Central Power and Light Co.,* 677 S.W.2d 610, 617–18 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). Sage Street points out that Northdale also pled a fraud cause of action, based on Myers's representation that Northdale's $760,000 fee, over and above actual cost, was "sacred." The evidence pertinent to contract interpretation, Sage Street argues, was also relevant to this cause of action, so Sage Street cannot be deemed to have consented to trial of the unpled issue by failing to object.

This may be true for some, but certainly not all, of the evidence introduced at trial on this subject. Gribble's interpretation of the contract, for example, has no bearing on the alleged fraud against Evans and Northdale. Sage Street's defense of the fraud action was not to show that the meaning of the contract was consistent with the representations Evans claimed were made (*i.e.,* that the $760,-000 was a guaranteed profit regardless of cost); indeed, Sage Street vigorously argued the opposite. Rather, Sage Street's defense of the fraud action was to show that if Evans ever believed that he had a deal for a guaranteed $760,000 profit, this belief could not have survived once the contract was committed to writing; Sage Street also argues that Northdale's performance under the contract shows that it really had no such understanding. Gribble's view of the meaning of the contract was not relevant to this defense or to Northdale's fraud claim.

Of course, as this Court stated in *Harkey v. Texas Employers' Ins. Ass'n,* 208 S.W.2d 919 (Tex.1948): "Certainly issues are not *tried* merely by the hearing of testimony thereon." *Id.* at 922; *see also Wendell,* 677 S.W.2d at 618 ("[W]e must examine the record not for evidence of the issue, but rather for evidence of *trial* of the issue."). It seems plain on this record, though, that the jury was called upon to resolve this dispute in deciding the sum Northdale was owed "pursuant to the contract for the work it performed, its overhead, and its profit, if any." The guaranteed $760,000 profit was one of the five components of Northdale's claimed damages (along with unpaid change orders, unreimbursed utility payments, work described in the last pay application, and retainage). By allowing the damages question to go to the jury without any kind of instruction as to its allowance for a $760,000 profit, after conflicting testimony had been presented on this subject, Sage Street consented to resolution of the issue by the jury.[13] Thus, the trial court correctly submitted this ambiguity to the jury despite the failure of either party to plead the issue. Northdale's construction is necessary to sustain the verdict; without the $760,000 as a separate item, Northdale's evidence advanced at trial appears to support a maximum award of $1,999,018.[14] However, the factual sufficiency of the evidence of the parties' intent necessary to support Northdale's construction cannot be decided by this court, and the

---

**13.** Sage Street did object to the damages question on the basis that there was no evidence or insufficient evidence that Northdale was owed any further money under the contract. This objection was not sufficient to prevent the ambiguity issue from being tried by consent, however, since it neither referred to Northdale's failure to plead ambiguity nor specifically pointed out how the question was inconsistent with its interpretation of the allegedly unambiguous contract. Sage Street's objection was that "the contract deals, specifically deals, with the issue of the amount of money to which Northdale is entitled, including its overhead and profit," and "the evidence is overwhelming that Northdale in fact received its overhead and profit on this job."

**14.** Northdale's final pay application would support the view that it was owed $1,611,605 for current work plus the full retainage. To this sum could be added $328,099 for unpaid change orders and $59,314 for unreimbursed utility and testing expenses. This calculation assumes that Northdale was paid only $11,014,165, rather than the $11,103,204 figure recited by the court of appeals. The higher figure was Gribble's calculation, but there seems to be evidence in Northdale's pay applications and Evans's testimony to support the lower figure.

court of appeals must review that evidence on remand.

## IV.

Finally, Sage Street contends that the court of appeals erred in basing Northdale's allowable recovery on the contract price without deducting Northdale's cost to complete the work. It does not attack the jury charge but instead the failure of the court of appeals to employ the measure of damages submitted to the jury in reviewing the sufficiency of the evidence to support the damage award.

■ Although courts of appeals act as final arbiters of factual insufficiency issues, that review must be made within the applicable legal constraints. It is well-established that this court has jurisdiction to determine if a correct standard has been applied by the intermediate court. *Pool v. Ford Motor Co*, 715 S.W.2d 629, 634–35 (Tex.1986); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 666, 244 S.W.2d 660, 662 (1951).

■ The jury was instructed to calculate damages for the construction contracts at issue based on the costs of the work performed plus overhead and profit. In answering the question, the jury was required to determine whether or not, under the contracts, profit varied with costs. In reviewing the sufficiency of the evidence to support the jury award, the court of appeals began with a total contract price, subtracted amounts already received by the contractor, then added amounts owed for utilities and spent on change orders. It omitted from its computation the expenses avoided by the contractor by not completing the job. Whether the evidence was sufficient under the court of appeals' calculation does not establish whether the evidence was sufficient to support the damage award under the theory submitted to the jury. The court of appeals erred in failing to apply the appropriate review standard.

Accordingly, we affirm that part of the judgment of the court of appeals which reformed the trial court's assessment of prejudgment interest to reflect a prevailing rate, but remand to the court of appeals for a factual insufficiency review in accordance with this opinion.

HECHT, J., notes his dissent, with opinion to follow.

CORNYN, J., notes his dissent.

HECHT, Justice, dissenting.

Northdale Construction Company contracted to build an apartment complex for Sage Street Associates for a maximum price of $13,535,000. Northdale contends that it was also promised an additional fee of $760,000, but Sage Street argues that that fee was included in the maximum price, and the contract between the parties is ambiguous on the point. Disputes between the two entities resulted in Sage Street's terminating Northdale before the project was completed, and this litigation ensued. The jury found that Sage Street breached the contract by terminating Northdale. Based upon this finding, Northdale is entitled to recover damages equal to amounts due and unpaid for work performed plus the profit it would have made under the contract had it been allowed to finish the job, which the jury found to be $2,491,110.

As the Court acknowledges, the evidence in this case is such that the jury verdict cannot be sustained unless two facts are true. One is that Northdale could have completed the project for approximately the maximum contract price. The other is that the parties intended by the ambiguous language of their contract for the $760,000 fee to be paid in addition to that maximum price. *Ante* at 446 n. 14. The first fact was not proved, and the second was not pleaded. To affirm the judgment for Northdale, the Court holds that Northdale was not required to prove the cost of completion, and that the issue of the parties' intent was tried by consent. I disagree with both these holdings and therefore dissent.

The Court concedes that if the contract in this case had involved a fixed price, Northdale would have the burden of proving the cost of completion as one element essential to its damages calculation. If the cost of completion exceeded the fixed price, any profit

would be diminished or altogether eliminated. On the other hand, if the contract required payment of all costs plus a profit, proof of the cost to complete would not be necessary as long as the contractor sought damages only for work fully performed. Proof of costs incurred would be sufficient to calculate damages, and the cost to complete would be irrelevant. If the contractor also sought damages for work he would have performed had he been allowed to complete the contract, then he must prove what that additional work would have cost in order to determine what "plus" he would have been entitled to. This burden could not be placed on the owner. If neither party put on evidence, what damages would the contractor recover? Damages in that situation could not be recovered without proof of the cost to complete. In sum, if cost to complete is relevant, the contractor must prove it.

The Court concludes that the contract in this case is more like a cost-plus contract than a fixed-price contract, and that Sage Street had the burden of proving the cost to complete. The inherent conflict between these conclusions proves both wrong. If the contract here were more like a cost-plus contract, proof of the cost to complete would not be Sage Street's burden, but would simply not exist. There is no need to prove the cost to complete a cost-plus contract if the claim is for damages for work already done. In this case, it is undisputed, and undisputable, that damages cannot be calculated without knowing whether Northdale could have completed construction of the project for less than the maximum price in the contract, increased by any other expenses it was entitled to be paid. Given that the cost to complete must be proved, who has the burden to do so? There is no basis in law or logic for shifting this burden to the defendant. There is certainly no basis for treating a maximum-price contract like this one any differently than a fixed-price contract, in these circumstances.

The Court states:

We hold that, where the owner is responsible for the contractor's incomplete performance under a cost-plus contract, proof that the cost ceiling would have been met is not part of the contractor's *prima facie* case. Since this is in the nature of a claimed credit to which the owner must prove his entitlement, Northdale's failure to offer evidence of completion cost does not bar recovery.

*Ante* at 443. With all due respect, this is nonsense. In a cost-plus contract there is no cost ceiling to prove because none exists. That is the very nature of a cost-plus contract. If there is a cost ceiling, as there is in this case, then the contract is either fixed-price or maximum-price, and the effect is the same: damages cannot be computed unless it is known whether the ceiling would have been met. In both situations the burden is, and ought to be, on the plaintiff to prove the fact as an element of damages.

Sage Street offered evidence that the cost to complete the project was over $2.8 million. If that evidence were believed, Northdale would not be entitled to any damages. Northdale was obliged to prove what the cost to complete was, and because it failed to do so, the verdict cannot be sustained.

The second fact necessary to support the verdict is also missing. The Court correctly holds that the contract here is ambiguous on the issue of whether the $760,000 fee was included in the maximum price. Neither party pleaded ambiguity. However, the Court concludes that the issue was tried by consent. The Court acknowledges that an issue is not tried by consent if testimony relevant to that issue is also relevant to other issues raised by the pleadings. The only evidence the Court cites as relevant only to the unpleaded issue is the testimony of an expert witness, James Gribble. The Court states that Gribble interpreted the contract to call for an additional $760,000 fee. This is wrong. Gribble did not interpret the contract, nor was he competent to do so; rather, he *assumed* that the fee was additional. Specifically, he testified as follows:

Q. Mr. Gribble, did you make an assumption about how the two contracts worked together from the point of view of whether or not there is a cap on costs and that sort of thing?

A. Yes, sir.

Q. And what were your assumptions, and how do the contracts—how did you assume the contracts work?

A. That the contracts are a guaranteed maximum price for Northdale's work, as defined in the contracts with a cap of $13,535,000 plus any modifications done in accordance with the contract, plus a profit of $760,000.

An expert's assumption is not evidence of the parties' intent.

There was nothing in the evidence or argument adduced at trial to put Sage Street on notice that Northdale claimed the contract was ambiguous or that the issue of he parties' intent was to be submitted to the jury. The nature of the $760,000 fee—the second fact essential to the verdict—was not properly determined at trial.

Inasmuch as the evidence is legally insufficient to support the jury verdict, the judgments of the lower courts should be reversed and judgment rendered for Sage Street. I would not reach the interest issue addressed by the Court.

CORNYN, J., joins in this dissenting opinion.