NORTH CENTRAL OIL
CORPORATION,
Appellant,

v.

THE LOUISIANA LAND AND EXPLORATION COMPANY, W.A. Moncrief, Jr., and Moncrief Partners, L.P., Appellees.

No. 01–98–00703–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

May 11, 2000.

Publication Ordered June 8, 2000.

Michael T. Swaim, David Lynn Stevens, Mark Allen Flanagan, Houston, for Appellant.

Rhett G. Campbell, David A. Furlow, Matchell E. Ayer, William Pannill, Roy L. Barnes, Houston, for Appellee.

Panel consists of Justices O'CONNOR, WILSON, and ANDELL.

## OPINION ON REHEARING

MICHOL O'CONNOR, Justice.

North Central Oil Corporation ("North Central"), the plaintiff below and appellant here, appeals from take-nothing summary judgments rendered in favor of The Louisiana Land and Exploration Company ("LL & E"), and W.A. Moncrief, Jr. and Moncrief Partners, L.P. ("Moncrief"), the defendants below and appellees here. In an opinion dated December 23, 1999, we reversed the summary judgments and remanded the cause to the trial court for further proceedings. LL & E and Moncrief filed motions for rehearing. We grant the motions in part and deny in part, withdraw our opinion of December 23, 1999, and issue this opinion in its place. We affirm in part and reverse in part.

### A. Factual Background

#### 1. The Wolf Leases

Erving Wolf, a Houstonian doing business as Wolf Exploration Company, ("Wolf") acquired oil and gas leases in the Wind River Basin in Wyoming (the "Wolf Leases"). The Wolf Leases lie in the Madden Deep Unit and Long Butte Unit in Fremont and Natrona Counties, Wyoming. In 1968, Wolf and his investors decided to farmout the Wolf Leases, and signed a series of almost identical farmout agreements with several oil companies (the "Wolf Agreements"). In the Wolf Agreements, Wolf and his investors are referred to as the "Assignors." Under one agreement, one-eighth of the Assignors' interest was transferred to North Central. A second agreement transferred one-eighth of the Assignors' interest to Sohio Petroleum. A third agreement transferred one-eighth of the Assignors' interest to Stonehenge Oil Company. A fourth agreement transferred one-eighth of the Assignors' interest to Sentinel Development Corporation.

LL & E acquired Sohio's interest in the Wolf Leases. Moncrief acquired Stonehenge's interest in the Wolf Leases. Monsanto Oil Company acquired Sentinel's interest in the Wolf Leases. BHP Petroleum (Company) Inc. ("BHP") purchased all the stock of Monsanto, thus acquiring Monsanto's interest in the Wolf Leases. BHP later offered to sell its interest in the Wolf Leases to a number of potential buyers, including North Central. BHP sold its interest in the Wolf Leases (the "BHP Lease Interests") to LL & E. LL & E then sold one-fourth of the BHP Lease Interests to Moncrief.

#### 2. The Lost Cabin Gas Plant

Twenty-five years after execution of the Wolf Agreements, LL & E (the Madden Deep Unit operator) proposed to build a processing plant to remove hydrogen sulfide from the gas produced from the Madden Deep Unit. North Central, Moncrief, BHP, and others entered into an agreement (the "Plant Agreement") with LL & E to join in the construction and ownership of what became known as the Lost Cabin Gas Plant (the "Plant"). BHP offered to sell its interest in the Plant to a number of potential buyers, including North Central. BHP sold its interest (the "BHP Plant Interest") to LL & E. LL & E sold one-fourth of the BHP Plant Interest to Moncrief.

### B. Procedural Background

North Central sued LL & E and Moncrief, asserting they were required to offer

North Central its proportionate share of the BHP Lease Interests and the BHP Plant Interest.[1] North Central alleged breach of contract, tortious interference with contract, and civil conspiracy.[2] The parties filed cross-motions for summary judgment. The trial court rendered summary judgment in favor of LL & E[3] and Moncrief,[4] without stating its grounds, and ordered that North Central take nothing against LL & E and Moncrief.

### C. Discussion

In issue one, North Central challenges the denial of its motion for summary judgment. In issue two, North Central challenges the granting of LL & E and Moncrief's motions for summary judgment with regard to North Central's breach-of-contract claim. In issue three, North Central challenges the granting of LL & E and Moncrief's motions for summary judgment with regard to North Central's tortious interference and conspiracy claims. All issues are based on North Central's assertion that the trial court incorrectly determined that LL & E and Moncrief were not obligated to offer North Central its share of the BHP Lease Interests and the BHP Plant Interest.

North Central contends there are two transactions at issue here: the purchase by LL & E of the BHP Lease Interests and the BHP Plant Interest from BHP and the purchase by Moncrief of the BHP Lease Interests and the BHP Plant Interest from LL & E. North Central asserts each transaction triggered its option to purchase its proportionate share of the acquired BHP Lease Interests and BHP Plant Interest.

### D. Standard

■ A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *See Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex.1993) (even if neither party pleads ambiguity, a trial judge may conclude a contract is ambiguous); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983) (although both parties asserted property

1. The BHP Lease Interests that are the subject of this litigation encompass only those leases within the Exhibit "F" area and the interest in the Plant. LL & E and Moncrief also acquired other leases from BHP that do not lie within the Exhibit "F" area. North Central does not assert an obligation on the part of LL & E and Moncrief to offer a share of any interests that lie outside the Exhibit "F" area.

2. North Central alleged LL & E and Moncrief (1) breached the Wolf Agreement, (2) tortiously interfered with business and contractual relations based on the breach of the contract, and (3) conspired together to breach the contract. As relief, North Central asked for (1) a constructive trust; (2) specific performance; (3) punitive damages; (4) declaratory relief, requesting the trial court's interpretation of the contract and the removal of LL & E and Moncrief as operators of the Madden Deep and Long Butte Units; and (5) injunctive relief, enjoining LL & E and Moncrief from exercising any of the working interest rights obtained from BHP, including rights with respect to the Lost Cabin Gas Plant.

3. LL & E moved for summary judgment on the grounds that (a) Article III did not apply to its purchase of the BHP Lease Interests;

therefore, it was not required to offer the BHP Lease Interests and the BHP Plant Interest to North Central; (b) North Central's other claims were mere variants of its breach of contract claim; therefore, there was no evidence to support North Central's claims of tortious interference, civil conspiracy, or that LL & E should be removed as an operator; and (c) North Central cannot recover punitive damages for breach of contract.

4. Moncrief moved for summary judgment on the grounds that (a) Article III did not apply to its purchase of the BHP Lease Interests; therefore, it was not required to offer the BHP Lease Interests and the BHP Plant Interest to North Central; (b) Moncrief was entitled to the same share it purchased from LL & E even if North Central's interpretation of Article III was correct; therefore, Moncrief did not damage North Central; (c) Article III did not apply to the Plant Agreement; (d) Moncrief should not be removed as the Long Butte Unit operator because North Central did not prove any grounds under which Moncrief could be removed. Moncrief also adopted LL & E's motion for summary judgment.

settlement agreement was unambiguous and moved for summary judgment, Supreme Court concluded agreement was ambiguous); *see also White v. Moore*, 760 S.W.2d 242, 243 (Tex.1988) (although both parties agreed will was unambiguous, Supreme Court decided, as a matter of law, that it was ambiguous).

 Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances existing when the contract was made. *Coker*, 650 S.W.2d at 394. We will consider the contract as a whole, and read each part in light of all other parts; meaning should be afforded to all language used by the parties if that can be done and a reasonable construction achieved. *Id.* at 393. A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Coker*, 650 S.W.2d at 393; *Hussong v. Schwan's Sales Enter., Inc.*, 896 S.W.2d 320, 324 (Tex.App.—Houston [1st Dist.] 1995, no writ). On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue regarding the parties' intent. *Coker*, 650 S.W.2d at 394.

### E. Article III of the Wolf Agreements

 Each Wolf Agreement contained the following Article III:

#### AFTER ACQUIRED LEASES

In the event that *either party acquires an interest in oil and gas leases* within the area delineated by the solid heavy line on the map attached hereto as Exhibit "F," *it shall promptly offer an interest therein* by notice in writing, describing the terms and conditions applicable to such acquisition, *to the other party and any third parties owning interests in the Exhibit "A" and "B" leases in proportion to the ownership of each such party in said leases.* Such interests shall be offered on the basis of actual costs of acquisition. Any offeree hereunder shall have ten (10) days in which to elect by written notice to offeror to participate in such acquisition. Failure to respond within said period shall be deemed an election not to participate. Each party electing to participate shall have the right to acquire an interest in the proportion that its interest assigned hereunder bears to the interest of all electing parties and shall tender its proportionate share of the acquisition cost within fifteen (15) days after receipt of a formal assignment of such interest. Wolf Exploration Company shall, as to such leases, be entitled to the same overriding royalty, provided for hereinabove in paragraphs 1.1.1 through 1.1.5.

Virtually all the land subject to the Exhibit "A" and "B" leases, plus additional land not then leased, lies within the area designated on a map that was attached as an exhibit to the Wolf Agreements.[5]

### 1. LL & E and Moncrief's interpretation of Article III

 LL & E and Moncrief assert Article III is an "area of mutual interest" provision [6] under which interests in *new or*

---

5. The map is Exhibit "D" to the Wolf North Central agreement and Exhibit "F" to the Wolf Sohio agreement. For the purpose of this opinion, we will refer to the area designated on the map as the Exhibit "F" area.

6. An "area of mutual interest" provision is described as follows: "In an area of mutual interest agreement, the parties attempt to describe a geographic area within which they agree to share certain additional leases acquired by any of them in the future." *West-*

land Oil Dev. Corp. v. Gulf Oil Corp., 637 S.W.2d 903, 905 (Tex.1982); *see also* 8 Williams & Meyers, *Oil & Gas Law: Manual of Oil and Gas Terms* 56 (1998 ed.) (same). The purpose of the area of mutual interest clause

is to insure every party to the operating agreement an opportunity to acquire a proportionate interest in any acquisitions within a specified area encompassing the contract area, regardless of the state of development of

*additional leases only* must be offered to other Wolf Agreement participants. LL & E and Moncrief contend Article III applies to after-acquired leases, and not existing leases that have already been offered, unless those leases terminate and another party to the Wolf Agreements then reacquires the expired lease. LL & E and Moncrief claim the BHP Lease Interests are not within the scope of Article III because they were existing leases already covered by the Wolf Agreements, not leases reacquired after they terminated.[7]

LL & E and Moncrief argue that other provisions of the Wolf Agreement, when read together with Article III, support their argument. The first prefatory paragraph of the Wolf Agreements defines the phrase "said leases" as follows: "the respective Assignors are individually the owners of certain oil and gas leases *(hereinafter called "said leases")* as more specifically described in Exhibits 'A' and 'B' attached hereto and made a part hereof. . . ." (Emphasis added.) Article III begins, "In the event that either party acquires an interest in *oil and gas leases* within the area delineated by the solid heavy line on the map. . . ." (Emphasis added.) LL & E and Moncrief claim that the "oil and gas leases" mentioned in Article III exclude the Exhibit "A" and "B" leases because the Exhibit "A" and "B" leases are defined as "said leases." Therefore, LL & E and Moncrief conclude that if the original participants to the Wolf Agreements had intended Article III to apply to the Exhibit "A" and "B"leases, the phrase "said leases" would have been included in the language of Article III instead of the phrase "oil and gas leases."

LL & E and Moncrief assert that Article III applies to the Exhibit "A" and "B" leases only when those leases terminate and are then reacquired by a party to the Wolf Agreements because of the following language of paragraph 1.1.1:

> As to any of said leases which are not subject to any overriding royalties previously created in favor of third parties, Assignors shall reserve an overriding royalty of three and one-half per cent (3½%) of all (8/8th) of the oil, gas and associated hydrocarbons produced, saved and sold therefrom. As to any of said leases which are subject to such previously created overriding royalties, Assignors shall reserve a two and one-half per cent (2½%) overriding royalty or such smaller overriding royalty, if any, so that the total overriding royalty burdening any of said leases does not exceed six and one-quarter per cent (6¼%). *In the event any of said leases terminates and is subsequently re-acquired by either party hereto, it shall be considered as an "after-acquired lease" under Article III hereinbelow* except that the individual Assignor who owned such lease at the date of execution of this agreement shall be entitled to the same overriding royalty which it owned thereunder prior to such termination.

(Emphasis added.) LL & E and Moncrief conclude that because the BHP Lease Interests had not terminated and then been reacquired by LL & E or Moncrief, the BHP Lease Interests are not "after-acquired leases" under Article III. LL & E

the newly acquired acreage. In simplified form, the area of mutual interest clause requires that any party acquiring any oil and gas interest within the contract area . . . give notice of the acquisition and its terms to all other parties to the operating agreement, who then have an option for a specified period to elect to participate in the acquisition.

Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and Enforceability*, 19 Tex.Tech L.Rev. 1263, 1345–46 (1988).

7. LL & E and Moncrief rely on Article III's title, "After Acquired Leases," for their contention that Article III is an area of mutual interest clause meant to apply only to purchases of after-acquired leases from third parties and not to transfers among Wolf Agreement participants. However, as North Central correctly notes, paragraph 8.4 of the Wolf Agreement provides that captions are for convenience only and should not be construed as a part of the agreement.

and Moncrief argue that "said leases" cannot be included within "oil and gas leases" in Article III in order to give effect to the phrase "it shall be considered an 'after-acquired lease' under Article III" in paragraph 1.1.1. Otherwise, LL & E and Moncrief contend, the phrase "it shall be considered an 'after-acquired lease' under Article III" in paragraph 1.1.1 would become mere surplusage.

### 2. North Central's interpretation of Article III

North Central asserts Article III is an "after-acquired rights" provision [8] that gives North Central the right to purchase a share of any interest in leases acquired by LL & E and Moncrief in the Exhibit "F" area. North Central argues that LL & E and Moncrief's interpretation of the phrase "oil and gas leases" contained in Article III is too narrow because the BHP Lease Interests are "interest[s] in oil and gas leases," as that phrase is used in Article III.[9] North Central asserts the phrase "said leases" is included in Article III for only one purpose: to define how the portion of the interest each Wolf Agreement participant is entitled to be offered should be determined. In other words, the interest in oil and gas leases is to be offered to each participant in proportion to its ownership interest in "said leases."

North Central relies on *Courseview, Inc. v. Phillips Petroleum Co.*, 158 Tex. 397, 312 S.W.2d 197 (1957), for its contention that an interest in *any* lease, not just newly acquired leases, acquired by a Wolf Agreement participant is subject to Article III. In that case, Courseview claimed the right to purchase an interest in property acquired by Phillips after the execution of a contract that conveyed certain mineral leases. The language in dispute was paragraph 7 of the contract, which stated as follows:

Either party hereto shall have the right to purchase any royalty or mineral interest of fee title within the Chocolate Bayou Prospect area, which shall be deemed to include all lands within a radius of two and one-half (2 1/2) miles of the center of Section Five (5), H.T. & B. Survey, Abstract 221; but it is agreed that, in the event First Parties shall purchase any such royalty, or mineral interest, or fee title, Second Party shall have the right to purchase from First Parties an undivided three-fourths (¾) interest therein, upon paying First Parties three-fourths (¾) of the total cost of acquiring such interest; and, likewise, in the event Second Party shall purchase any such royalty, or mineral interest, or fee title, First Parties shall have the right to purchase from Second Party an undivided one-fourth (¼) interest therein, upon paying to Second Party one-fourth (¼) of the total cost of acquiring such interest. Either party, upon purchasing any such royalty or mineral interest or fee title, shall notify the other party thereof in writing and the other party shall have twenty (20) days thereafter within which to elect in writing whether or not to purchase an undivided interest therein as above provided. The total cost of acquiring any royalty or mineral interest or fee title shall be deemed to include all commissions paid on such purchases and the cost of abstracts and title examinations.

*See Courseview, Inc. v. Phillips Petroleum Co.*, 298 S.W.2d 890, 894 (Tex.Civ.App.—Galveston 1957), *rev'd*, 158 Tex. 397, 312 S.W.2d 197 (1957) (containing full text of paragraph 7).

---

8. An "after-acquired rights" provision is defined as "A clause in a lease, joint venture, farmout or other agreement designed to afford parties to the agreement the right to share in specified future acquisitions of interest by another party to said agreement." Williams & Meyers, *supra*, at 32.

9. North Central notes that LL & E and Moncrief's narrow interpretation of the phrase "oil and gas lease" is similar to arguing that the phrase "all cars" does not include "certain cars painted red."

After execution of the contract, Phillips acquired certain overriding royalty interests in lands within the designated area, and Courseview claimed the right to purchase its proportionate share. When Phillips purchased the overriding royalty interests, it already owned the leasehold estate out of which the overriding royalty interests had been carved. Phillips argued that the purchase of the overriding royalty interests merely completed its ownership of the leasehold estate and, therefore, such purchases were not subject to Courseview's purchase option right. The Supreme Court disagreed.

The Supreme Court noted that the parties had agreed, without limitation of any kind, that any royalty or mineral interest would be subject to the purchase rights. *Courseview*, 312 S.W.2d at 208. The Court stated that, although an overriding royalty was carved out of the working interest, it nevertheless was one type of royalty and was also an interest in the minerals. *Id.* The Court concluded that the parties intended paragraph 7 to create reciprocal rights except with respect to the fractional share each might purchase in property acquired by the other. *Id.* The Court held as follows:

> The right of one party to acquire its specified share in a mineral or royalty interest purchased by the other was to be no different from the right of the latter in the event the situation were reversed. If Beaty [Courseview's successor-in-interest] had purchased the overriding royalties here in controversy, or if Phillips had acquired the same at a time when it did not own the leasehold estate, the other party clearly would have the right to purchase an interest therein. We think the parties must have intended for Beaty to have the same right when the royalty was purchased by Phillips after acquiring the leasehold estate.

*Id.*

North Central contends LL & E and Moncrief's argument is similar to that made by Phillips in *Courseview*. There, the Supreme Court rejected Phillips's argument that the overriding royalty interests were not subject to Courseview's contractual purchase right because they were carved out of the leasehold estate Phillips already owned. Here, North Central urges this Court to reject LL & E and Moncrief's argument that the BHP Lease Interests are not subject to Article III because those interests were formerly owned by another party to the Wolf Agreements (BHP).

### 3. LL & E and Moncrief's response to North Central's interpretation

LL & E and Moncrief argue that North Central's reading of Article III would lead to an absurd result in that the last sentence of Article III would make no sense. Article III ends by stating, "Wolf Exploration Company shall, as to such leases, be entitled to the same overriding royalty, provided for hereinabove in paragraphs 1.1.1 through 1.1.5." LL & E and Moncrief contend that North Central's interpretation of Article III would mean that Wolf's overriding royalty would increase over and over again each time one Wolf Agreement participant conveyed an Exhibit "A" or "B" lease to another Wolf Agreement participant.

LL & E and Moncrief also contend North Central's interpretation of Article III transforms Article III into a "preferential right to purchase" provision, which is defined as follows:

> [A] preferential right of purchase, also known as a preemptive right or right of first refusal, is a right granted to a party giving them the first opportunity to purchase property if an owner decides to sell it. . . . Preferential rights of purchase have a generally well-understood meaning within the business world that the rightholder must be given an opportunity to purchase the property from the property owner on the terms offered by any third party . . . . Consequently, as with all contractual rights

supported by consideration, such rights are enforceable.

* * *

Once the property owner conveys the terms of the offer to the rightholder, the rightholder then has the power to accept or reject the offer.

*Abraham Inv. Co. v. Payne Ranch, Inc.,* 968 S.W.2d 518, 524 (Tex.App.—Amarillo 1998, writ denied) (citations omitted).

LL & E and Moncrief's argument relies heavily on the parties' having deleted a "preferential right to purchase" provision from the 1956 Model Form Operating Agreement, which was incorporated by reference into the Wolf Agreements. LL & E and Moncrief assert that the parties' deletion of this provision proves the parties' agreement that they would have no contractual duty to offer the other Wolf Agreement participants any interests the participants transferred among themselves.

### F. The Plant Agreement

The Plant Agreement contains the following provision:

5.8 *Subsequent Plant Ownership Adjustments.* It is the intent of the Owners hereto to have Plant ownership correspond as closely as possible to each Plant Owner's Committed Working Interest in the Sour Gas Paleozoic PA "A." An ownership adjustment shall be made for:

5.8.1 Subsequent revisions to the Sour Gas Paleozoic Participating Area "A." Each Owner's Plant Ownership Interest shall be adjusted to correspond to each Owner's Committed Working Interest in the Sour Gas Paleozoic Participating Area "A" revision. That portion of each Owner's Plant Ownership Interest attributable to the assumption of the interest of non-participating Producers (in accordance with Section 5.5) shall also be adjusted proportionately to correspond to the non-participating Producer's Committed Working Interest in the Sour Gas Paleozoic Participating Area "A" revision.

### 1. LL & E and Moncrief's interpretation of the Plant Agreement

LL & E and Moncrief contend the Plant Agreement does not require a party acquiring an interest in the Plant to offer a share of that interest to other Wolf Agreement participants. LL & E and Moncrief assert that because Article III applies only to oil and gas leases, and the Plant is not an interest in an oil and gas lease, a transfer of an interest in the Plant does not fall within the scope of Article III. Although LL & E and Moncrief concede that section 5.8 contains language encouraging ownership interests in the Plant to correspond to working interest ownership, they argue that the Plant Agreement does not require such a correspondence.

### 2. North Central's interpretation of the Plant Agreement

North Central contends the Sour Gas Paleozoic Participating Area "A" referred to in section 5.8 means an oil and gas producing zone underlying some of the leases at issue here. This zone is commonly known as the Madison formation and consists entirely of Exhibit "A" and "B" leases. Therefore, North Central concludes that every time ownership interest in the Madden Deep Unit changes, so also should ownership interest in the Plant change.

### G. Extrinsic Evidence

The parties refer us to extrinsic evidence in support of their interpretations of Article III and the Plant Agreement. Each party asserts its extrinsic evidence is admissible to show consistency with, rather than variance from, its interpretation of Article III and the Plant Agreement.

North Central relies on the testimony of Charles Pirtle, North Central's general

counsel who was involved in the drafting of the Wolf Agreements. According to Pirtle, Article III is an "after-acquired rights" provision to ensure that anyone acquiring an interest in any lease in the Exhibit "F" area would offer a share of that interest to the other Wolf Agreement participants to preserve uniformity of interest among the original participants. Pirtle stated that area-of-mutual-interest clauses were not in common usage in 1968 when the Wolf Agreements were drafted. North Central also contends that the conduct of the participants over the past 30 years has been consistent with its interpretation of Article III and the Plant Agreement.

LL & E and Moncrief rely on an opinion letter from an oil and gas attorney, Peter Bjork, who states that Article III does not require Wolf Agreement participants to offer interests in Exhibit "A" and "B" leases to other Wolf Agreement participants. LL & E and Moncrief also rely on the opinion of another expert, Al Cummings, for the proposition that North Central is attempting to construe Article III as giving the participants a preferential right to purchase. LL & E and Moncrief contend that the history of the Wolf Agreements proves the original participants construed Article III as a standard area of mutual interest clause that did not require the participants to offer interests purchased from one another.

 When a contract is reasonably susceptible to more than one meaning, extraneous evidence is admissible to determine the true meaning of the instrument. *Radx Corp. v. Demy*, 658 S.W.2d 298, 301 (Tex.App.—Houston [1st Dist.] 1983, no writ). However, summary judgment in such a case is improper, as the question of the true meaning of the contract becomes one of fact for the jury. *R & P Enter. v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517, 519 (Tex.1980); *Radx*, 658 at 301. Here, the parties' extrinsic evidence is contradictory and, in large part, dependent on the credibility of their experts. Each party submits its own expert's interpretation of Article III and the Plant Agreement and its own recitation of the history of dealings under the Wolf Agreements and the Plant Agreement. The parties' summary judgment evidence, at best, raises fact issues as to the parties' intent when drafting these agreements.

### H. Decision

**1. The Wolf Agreement**

 We do not agree with LL & E's contention that North Central's interpretation of Article III would transform that clause into a preferential right of purchase provision. A preferential right of purchase provision places an obligation on the *seller* to give the holder of the right notice of the proposed sale and offer the holder an opportunity to exercise the right. Conine, *supra*, at 1323. The preferential right of purchase provision relates to the disposition of property, whereas the area of mutual interest and after-acquired rights provisions relate to the acquisition of property. Conine, *supra*, at 1347. As North Central points out, if it had been attempting to enforce a preferential right to purchase clause, it would have sued BHP as the seller of the BHP Lease Interests. However, although we find LL & E and Moncrief's preferential right of purchase argument unpersuasive, the other arguments put forth by all parties are equally persuasive.

We conclude that the Wolf Agreement is ambiguous because it is capable of two meanings that are directly opposed, but equally credible. LL & E and Moncrief's interpretation of Article III and paragraph 1.1.1 is reasonable: Exhibit "A" and "B" leases (the "said leases") are subject to Article III *only* if and when those leases expire and are reacquired by a Wolf Agreement participant. However, North Central's interpretation is also reasonable: Article III's language "oil and gas leases within the area delineated by the solid heavy line on the map attached hereto as Exhibit 'F' " is broad language that in-

cludes "said leases"; i .e., those Exhibit "A" and "B" leases that lie within the solid heavy line. The only time "said leases" is used in Article III is to specify how the acquired interests should be apportioned among the Wolf Agreement participants.

As to LL & E and Moncrief's assertion that North Central's interpretation of Article III would allow Wolf's overriding royalty interest to increase again and again, an equally reasonable interpretation of paragraph 1.1.1 is that Wolf becomes entitled to reserve an overriding royalty (subject to the cap set forth in 1.1.1) it might not otherwise have owned in an Exhibit "A" or "B" lease only when that lease expires and is reacquired by a Wolf Agreement participant. Support for this interpretation is found in paragraphs 1.1.1 and 1.1.2. Under paragraph 1.1.1, the individual Assignor who owned an expired lease on the date the Wolf Agreement was executed is entitled to the same overriding royalty it owned before the lease terminated when the lease is reacquired by a Wolf Agreement participant under Article III. Paragraph 1.1.2 provides that the overriding royalty reserved under 1.1.1 is construed as to each Exhibit "A" and "B" lease as a reservation to the particular person or corporation listed in Exhibit "A" and "B" as the owner of the lease, and not as a cross-conveyance between the various Assignors. Therefore, one interpretation of this language is that Wolf would not be entitled to reserve an overriding interest in an Exhibit "A" or "B" lease that it did not already own until the lease expired and was reacquired under Article III.

**2. The Plant Agreement**

■ We conclude that the Plant Agreement is ambiguous because it is capable of two meanings that are directly opposed, but equally credible. LL & E's interpretation of the Plant Agreement is reasonable: LL & E concedes the Plant Agreement encouraged the ownership interests in the Plant to correspond to working interest ownership, but such a correspon-

dence is not required because the Plant is not an interest in an oil and gas lease and other provisions of the agreement support the interpretation that a sale of minerals does not trigger a Plant ownership adjustment. North Central's interpretation is also reasonable: Section 5.8 of the Plant Agreement provides that, as each owner's committed working interest in the Sour Gas Paleozoic Participating Area "A" changes, each owner's Plant ownership interest shall be adjusted. North Central contends, and L & E does not dispute, that the Sour Gas Paleozoic Participating Area "A" consists entirely of Exhibit "A" and "B" leases.

**3. Conclusion**

■ We reverse issues two and three in part and sustain in part. The true meaning of Article III and the Plant Agreement is subject to conflicting, but equally reasonable, interpretations; therefore, summary judgment on North Central's breach of contract claim was not proper and we reverse the trial court's judgment as to that claim. North Central's tortious interference and conspiracy claims are based on its interpretation of Article III; therefore, summary judgment was not proper on those claims and we reverse the trial court's judgment as to those claims. North Central does not challenge LL & E and Moncrief's entitlement to summary judgment on North Central's request that LL & E and Moncrief be removed as operators of the Madden Deep and Long Butte Units, respectively; therefore, we affirm the trial court's judgment as to LL & E's and Moncrief's remaining as operators of the Madden Deep and Long Butte Units, respectively.

Because issue one is premised on the interpretation of Article III and the Plant Agreement, which we have determined is a question of fact, we need not address the merits of this issue.

We affirm the trial court's judgment in part and reverse the trial court's judgment

in part and remand for further proceedings.

DAVIE L. WILSON, Justice, dissenting on rehearing.

I would grant the appellees' motion for rehearing and affirm the summary judgments in favor of the appellees.