**Reverse and Remand; Opinion Filed August 30, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00819-CV

**DAWN RICHARDS, Appellant**

**V.**

**BURNCO TEXAS, LLC AND CLIFFORD HAHNE, Appellee**

**On Appeal from the 162nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-11668**

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Myers

This is an appeal from a summary judgment granted in favor of appellees Burnco Texas,

LLC, and Clifford Hahne. In one issue, appellant Dawn Richards argues the trial court erred in

granting summary judgment because the termination of her independent contractor status with

Aflac released her from her contractual obligations. We reverse and remand.

### BACKGROUND AND PROCEDURAL HISTORY

Appellant Dawn Richards started working for the American Family Life Assurance

Company (Aflac) in April of 2006. Richards sold individual and group policies for Aflac as an

independent contractor. On March 16, 2007, she signed an "Associate's Agreement" (AA) with

Aflac that authorized her to solicit applications for insurance policies sold by Aflac. The AA

specifically provided that "[a]ssociate [Richards] represents, warrants, and agrees that the

performance of Associate under this Agreement shall be as an independent contractor of Aflac."

Paragraph ten of the AA, entitled "Arbitration and Other Legal Proceedings," included the following provision, a covenant not to sue:

10.6. Covenant Not to Sue: Associate [Richards] covenants and agrees that he/she shall not, directly or indirectly, assert or threaten to assert any claim, charge, action or cause of action (hereinafter "Claim") against (a) an Account or Prospective Account (which is defined as any individual or entity that Associate ever solicited for purposes of selling an Aflac policy or product), including all of the Account's or Prospective Account's past and present officers, trustees, directors, stockholders, employees, agents, partners and attorneys, or (b) a policyholder, which relates in any way to Associate's communications, dealings or relationship with the Account, Prospective Account or policyholder. Nothing contained in this Paragraph 10.6 shall prohibit Associate from asserting a claim against an Account or Prospective Account (including any of the entities or individuals described herein) or policyholder for a matter that is completely unrelated to Aflac or Associate's representation of Aflac. Moreover, in the event that an Account or Prospective Account (including any of the entities or individuals described herein) or policyholder should assert a claim against Associate, Associate shall be free to assert any counterclaim against the Account or Prospective Account (including all of the entities or individuals described herein) or policyholder. Associate acknowledges that this covenant not to sue is for the benefit of Accounts or Prospective Accounts (including any of the entities or individuals described herein) and policyholders and, in addition, for Aflac in connection with its relationship with its Accounts, Prospective Accounts and policyholders. Associate further acknowledges that this covenant not to sue is an integral part of this Agreement and is supported by valuable consideration.

In 2007, Richards opened a group policy for Gateway, a company that was subsequently purchased by appellee Burnco Texas, LLC, a privately held construction materials company. Gateway had offered a "cafeteria plan" to its employees that continued after Burnco purchased Gateway. Appellee Hahne is the vice president of Burnco's United States operations.

On January 11, 2015, Richards signed an Aflac "Benefits Advisors Producer's Agreement" (BAPA) to sell insurance policies for Aflac Benefits Advisors, Inc. (ABA) through its ABA Exchange. The agreement provided in part:

WHEREAS, Producer [Richards] is in the business of soliciting insurance coverage as a representative of Broker and is currently appointed and authorized by American Family Life Assurance Company ("Aflac") to solicit applications for insurance policies offered for sale by Aflac pursuant to an Associates Agreement (the "AA") or a General Agent's Agreement (the "GA Agreement"), whereby such AA or GA Agreement is hereby being incorporated herein by reference

–2–

thereto[.]

With thirty-day written notice, either ABA or Richards could terminate the BAPA, and upon such termination, Richards's access to and permission to sell policies through the ABA exchange would be revoked.

Section five of the BAPA, also entitled, "Arbitration and Other Legal Proceedings," included the following covenant-not-to-sue provision:

> 5.6. <u>Covenant Not to Sue</u>. Producer [Richards] covenants and agrees that it will not, directly or indirectly, assert or threaten to assert any claim, charge, action, class action, or cause of action (hereinafter "Claim") against: (a) Broker, its parent, subsidiaries or affiliates, including aforementioned past and present officers, trustees, directors, stockholders, members, employees, agents, partners, and attorneys, (b) the Companies, or a policyholder or certificate holder that relates in any way to Producer's communications, dealings or relationship with such Company, policyholder, or certificateholder pursuant to Producer's authority under the terms of this Agreement, (c) the solicitation, submission or sale of an insurance product on the ABA Exchange or (d) related in any way to this Agreement. Nothing contained in this Paragraph 5.6 shall prohibit Producer from asserting any claims against a Company, policyholder, or certificateholder for a matter that is completely unrelated to Broker or to Producer's representation of Broker under the terms of this Agreement. Moreover, in the event that a Company, policyholder, or certificateholder should assert a claim against Producer, Producer is free to assert any counterclaim against such Company, policyholder, or certificateholder. Producer acknowledges that this covenant not to sue is for the benefit of the policyholders and certificateholders of the companies to which Producer is authorized to solicit and sell under the terms of this Agreement, and, in addition, for Broker in connection with its relationship with such Companies, policyholders, and certificateholders. Producer further acknowledges that this covenant not to sue is an integral part of this Agreement and is supported by valuable consideration.

The BAPA also stated that any appointment of Richards to sell insurance policies through the ABA Exchange was "expressly subject to and conditioned upon" Richards executing an "ABA Exchange Rider" to the Associate's Agreement (Exchange Rider).  Richards executed the Exchange Rider on the same day (and the same time) as the BAPA—January 11, 2015.  The Exchange Rider incorporated the AA by reference and added authority for Richards to "solicit, submit, and service applications of policies of insurance offered for sale by Aflac via the ABA

Exchange[.]"

Paragraph 5 of the Exchange Rider modified the AA and added, among other things, section 9.4, which reads as follows:

> 9.4 <u>Termination of Rider</u>. *The rights, duties and obligations as to Exchange Policies set forth herein may be terminated alone and without cause or reason by either Aflac or Associate* [Richards] by giving the other party 30 days' prior written notice, or such longer notice as may be required by applicable state law*, without terminating other rights set forth in the AA* [Associate's Agreement]. The termination of this Rider shall immediately constitute the termination of any Producer's Agreement between Associate and ABA to sell policies through the ABA Exchange without further act of any party. Likewise, the termination of any Producer's Agreement between ABA and Associate to sell policies through the ABA Exchange shall also immediately constitute the termination of this Rider without further act of any party.
>
> The termination of Associate's appointment with Aflac shall immediately constitute termination of this Rider and any Producer's Agreement between Associate and ABA [emphasis added].

Pursuant to the second paragraph in section 9.4, the termination of an associate by Aflac immediately terminated the Exchange Rider and the BAPA. The Exchange Rider also provided, however, in paragraph 6, that "except as expressly modified by this Rider, the terms and conditions of the AA remain in full force and effect and are hereby ratified and confirmed by the Parties hereto."

On November 18, 2015, Richards received an email message from Hahne stating that Burnco would be cancelling its cafeteria plan through Aflac effective December 31, 2015. Hahne informed Richards that Burnco would let its employees know they could contact her directly after business hours if they wanted to continue to purchase coverage with Aflac. The email further stated that the employees would be notified the next day, "but please do not contact them during business hours or prior to my announcement." Finally, Hahne's email advised Richards that "we will not be allowing any outside insurance people on our property going forward without my written approval."

–4–

Richards tried to convince Hahne to keep the group policy and emailed him several times about this matter. In the emails, Richards wrote to Hahne that his new broker was "only seeing dollar signs when it comes to the employees," that employee morale would "massively decline," and that she was a single mother "and this is my entire livelihood on the line here." Richards was asked ("very nicely," as she recalled in her deposition) not to attend the company's annual Christmas party. She met a Burnco employee (one of her clients, according to Richards) in the parking lot and gave them some gifts to take to the owners of Burnco. Along with the gifts was a letter addressed to the owners of Burnco, attempting to persuade them to keep their Aflac offering. Richards stated that she wanted to let "Mr. and Mrs. Burns know what's going on because it's their money. They're actually the owners. It's their money that's being affected by this decision."

The Monday following the Christmas party, Richards received a "cease and desist letter" from Burnco that barred her from coming onto Burnco property or contacting Burnco employees. Richards testified when she received the cease and desist letter she "stopped going to the company and stopped—and I did what he [Hahne] was asking me to do. Otherwise, before that I had permission to talk to my guys."

On January 7, 2016, Hahne wrote a letter to Greg Weeks of Aflac regarding Richards. The letter is not part of the summary judgment record and its contents are disputed, but on January 21st Aflac provided Richards thirty-day notice that it was terminating her status as an independent contractor. The notice of termination is not in the summary judgment record.

On September 13, 2016, Richards filed the underlying lawsuit against Burnco and Hahne (Bunrco defendants), alleging defamation and tortious interference with a contractual relationship. On March 5, 2018, Richards filed a first amended petition against the Burnco defendants. The Burnco defendants filed a traditional motion for summary judgment asserting

–5–

Richards's suit was barred by the covenants not to sue, to which Richards responded. The Burnco defendants replied to her response. The trial court granted the Burnco defendants' summary judgment motion, and Richards timely filed her notice of appeal.

## DISCUSSION

In her only issue, Richards argues "[t]he termination of the contracts" by Aflac released her from "the obligations contained therein."[1] Richards contends that, at the time her lawsuit was filed, she was no longer an "associate" of Aflac and she was no longer, therefore, bound by the covenants not to sue. Moreover, the covenants not to sue were of indefinite duration and were, as a result, disfavored under contract law. The Burnco defendants maintain that the "covenants not to sue unquestionably survived Aflac's termination of the contracts" and that her lawsuit represented "an unequivocal violation of her promise not to sue Aflac's customers" because her suit against the Burnco defendants was "based on the latter's communications and dealings with Aflac prior to the termination of its relationship with Richards." Accordingly, the Burnco defendants argue, Richards was contractually barred from bringing suit and the trial court properly granted summary judgment in the Burnco defendants' favor.[2]

The standard of review in traditional summary judgment cases is well-known. The issue on appeal is whether the movant satisfied his summary judgment burden by establishing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003); *Thomas v. Omar Inv., Inc.*, 129 S.W.3d 290, 292–93 (Tex. App.—Dallas 2004, no pet.). A defendant is entitled to summary judgment if it conclusively negates an essential element of

---

[1] We construe Richards's issue as also arguing that the trial court erred in granting summary judgment.

[2] In her reply brief, Richards also argues that the covenants not to sue violated public policy and constituted an unlawful restraint on trade. These issues were not raised in the trial court in Richards's response to the motion for summary judgment; therefore, we need not address them. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); TEX. R. APP. P. 33.1(a); *Affordable Motor Co., Inc. v. LNA, LLC*, 351 S.W.3d 515, 522 (Tex. App. —Dallas 2011, pet. denied).

the plaintiff's case or conclusively establishes all necessary elements of an affirmative defense. *Thomas*, 129 S.W.3d at 293; *Pollard v. Hanschen*, 315 S.W.3d 636, 638 (Tex. App.—Dallas 2010, no pet.). We review a trial court's grant of a traditional motion for summary judgment de novo. *Provident Life*, 128 S.W.3d at 215.

In construing a written contract, we must ascertain and give effect to the parties' intentions as expressed in the agreement. *Stephens v. Beard*, 485 S.W.3d 914, 916 (Tex. 2016). To do so, we consider the agreement as a whole. *Id.* We presume the words of a contract reflect the parties' intent, but we must construe words in the context in which they are used. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 764 (Tex. 2018). If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and courts should construe it as a matter of law. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). If a contract is susceptible to more than one reasonable interpretation, it is ambiguous. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances existing at the time the contract was entered into. *Id.* at 529. A court may conclude a contract is ambiguous even in the absence of such a pleading by either party. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993). When a contract contains an ambiguity, granting summary judgment based on the contract is improper because the intent of the contracting parties is an issue of fact. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).

The Burnco defendants' traditional motion for summary judgment argued Richards could not sue them because of the covenants not to sue in section 5.6 of the BAPA and section 10.6 of the AA, and that they could enforce those agreements as third-party beneficiaries. The Burnco defendants' status as third-party beneficiaries is not disputed in this appeal. In her response to

the summary judgment motion, Richards argued there was no agreement that prohibited her lawsuit because she filed suit after the termination of her agreement with Aflac. In other words, at the time her suit was filed, she was no longer an "associate" as that term was defined in the agreement and, thus, no longer subject to its terms.

The Burnco defendants' reply to the summary judgment response asserted that the Exchange Rider added paragraph 9.4 to the AA. That paragraph stated in part that "[t]he rights, duties and obligations as to Exchange Policies set forth herein may be terminated alone and without cause or reason by either Aflac or Associate by giving the other party 30 days' prior written notice . . . . *without terminating other rights set forth in the AA* [emphasis added]." According to the Burnco defendants, Richards was still bound by the covenant not to sue in the AA because the Exchange Rider contained an express provision which provided that the rights under the AA survived the termination of the BAPA. Moreover, the Burnco defendants asserted that the AA contemplated the survival of at least some parts of the agreement—e.g., the covenant not to sue in section 10.6, which they pointed out is in the same paragraph of the agreement as the arbitration provisions, entitled, "Arbitration and Other Legal Proceedings."

However, closer examination of section 9.4 and the summary judgment record does not persuade us the Burnco defendants' conclusively proved section 9.4 provided for the continuation of the AA's covenant-not-to-sue following the termination of the BAPA. To begin with, the plain language of the provision indicates that section 9.4 is operative if what was terminated was "[t]he rights, duties and obligations as to Exchange Policies" in the AA. The BAPA defined "Aflac Exchange Policy(ies)" as "Aflac and/or CAIC product(s) sold on the ABA Exchange," but there is no mention of "Exchange Policies" anywhere in the AA except for paragraph 9.4, which also does not define the term. Another problem is that the record does not establish what the termination of "rights, duties and obligations as to Exchange Policies"

entailed, or whether only Richards's "rights, duties and obligations" relating to Exchange Policies were terminated. Richards asserted in her affidavit that she was terminated as an independent contractor in January of 2016, but the termination notice is not in the record. The Burnco defendants had the summary judgment burden of establishing in the trial court that they were entitled to judgment as a matter of law based on section 9.4. We conclude they have failed to meet their summary judgment burden.

Regarding the Burnco defendants' contention that the AA reflected that certain contractual provisions should remain operative after the termination of the independent contractor relationship between Aflac and Richards, there is an expression of intent by the parties that *some* provisions survive termination. Section 3.1.2, for example, concerns "Protection of Confidential Information," and it provides that "[a]ssociate hereby agrees that all Confidential Information is and shall remain the property of Aflac exclusively, both before and after the termination of this Agreement, and Associate shall have no property rights therein." Section 7.1, "Payments of Renewal Commissions to Associate," provides in part that "[a]t and after the termination of this Agreement, Aflac's obligation to pay Renewal Commissions shall be contingent upon Associate's faithful performance and observance of his/her obligations and covenants under this Agreement." Section 8.3 applies to "Nonsolicitation of Representatives . . . [d]uring the term of this Agreement and for a period of two (2) years after its termination for any reason." Section 8.4 similarly concerns "Nonsolicitation of Policyholders and Accounts . . . [d]uring a term of this Agreement and for a period of two (2) years after its termination for any reason."

The arbitration provision in section 10.1 of the AA, like the covenant not to sue in section 10.6, does not have the termination-survival language found in the above provisions, nor is there language expressing an intent by the parties for it to survive the termination of Richards's

independent contractor relationship with Aflac. The Burnco defendants noted in their reply to the summary judgment response that both provisions are in the same paragraph of the AA, entitled "Arbitration and Other Legal Proceedings." They argued, "Obviously, the covenant not to sue was placed under the same heading as the arbitration clause because both are similarly intended to remain operative after the termination of Plaintiff's appointment as an Aflac Associate." In fact, an agreement to arbitrate contained in a written contract has been held to be separable from the entire contract and valid and enforceable despite an attack made upon the contract as a whole. *See, e.g., BBVA Compass Inv. Solutions, Inc. v. Brooks*, 456 S.W.3d 711, 718 (Tex. App.—Fort Worth 2015, no pet); *Lexington Ins. Co. v. Exxon Mobile Corp*., No. 09–16–00357–CV, 2017 WL 1532271, at *6 (Tex. App.—Beaumont March 2, 2017, no pet.) (mem. op.). But the separability of an arbitration provision is based on the idea that the arbitration provision is separable from the contract in which it is embedded because a challenge to the validity of the entire agreement is a question for the arbitrator, while a challenge directed to the arbitration provision itself may be resolved by the court. *See, e.g., RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 124 (Tex. 2018). The question here is whether a covenant-not-to-sue of the kind relied upon by the Burnco defendants is similarly separable from the rest of the contract. The Burnco defendants do not cite, nor have we found, any Texas cases so holding, and we decline their implicit invitation to apply the doctrine of separability to the instant covenant-not-to-sue. We again conclude they failed to meet their summary judgment burden.

We conclude the Burnco defendants failed to establish as a matter of law that section 9.4 in the Exchange Rider provided for the continuation of the AA's covenant-not-to-sue following the termination of the BAPA, or that the covenant not to sue was separable from the rest of the agreement. Because the provision is subject to more than one reasonable interpretation, it is ambiguous, creating a fact issue on the parties' intent. Hence, the trial court erred by granting

–10–

the Burnco defendants' traditional motion for summary judgment. We resolve Richards's issue in her favor.

We reverse the trial court's order granting summary judgment and remand for further proceedings.

/Lana Myers/
LANA MYERS
JUSTICE

180819F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DAWN RICHARDS, Appellant

No. 05-18-00819-CV        V.

BURNCO TEXAS, LLC AND CLIFFORD
HAHNE, Appellee

On Appeal from the 162nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-11668.
Opinion delivered by Justice Myers. Justices
Molberg and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.  It is **ORDERED** that appellant DAWN RICHARDS recover her costs of this appeal from appellee BURNCO TEXAS, LLC AND CLIFFORD HAHNE.

Judgment entered this 30th day of August, 2019.

–12–