

COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

| | | |
|---|---|---|
| RALPH MIRANDA, | § | No. 08-23-00270-CV |
| Appellant, | § | Appeal from the |
| v. | | 34th District Court |
| VICTOR M. DIAZ, ZENAIDA B. DIAZ, and MARINA B. DIAZ, | § | of El Paso County, Texas |
| Appellees. | | (TC# 2021DCV4287) |
| | § | |

**MEMORANDUM OPINION**

This appeal arises out of a lawsuit in which Appellant Ralph Miranda sought to rescind a vendor's lien and take possession of a home in which Appellees, Victor M. Diaz, Zenaida B. Diaz, and Marina B. Diaz (collectively, the Diazes), claimed an interest. Following a bench trial, the trial court denied Miranda's request and "granted" the Diazes' affirmative defense of payment, finding the Diazes' obligation on the note had been satisfied except for a balance of $1509 owed to Miranda. We affirm the portion of the judgment denying Miranda's request to rescind his vendor's lien and regain possession of the property, and we reverse the portion of the judgment granting the Diazes' affirmative defense of payment and finding that after paying Miranda $1,509 "nothing further will be due and owing" on the home.

1

# I. FACTUAL BACKGROUND

It is undisputed that Miranda purchased a note and vendor's lien on the subject property on Tenaha Avenue in El Paso County (the Tenaha Home) from a bankruptcy trustee in October 2021. What is in dispute is whether the note was in default and whether the note has been paid off. Because the Tenaha Home has a history of conveyances with multiple promissory notes and vendor's liens not well-documented in the record before us, we begin with an overview of those conveyances as best we understand them.

## A. Trien purchases the Tenaha Home in 1996

Sometime prior to 1996, Harold E. Wright, Sr. and Mary F. Wright purchased the Tenaha Home, mortgaged through Charter Mortgage (later purchased by Bank of America), which held an express vendor's lien on the home. Trien purchased the home in January 1996 for $66,104.00, with a "wrap around mortgage," requiring Trien to make payments to Charter on the Wrights' behalf.[1] As discussed in more detail below, the parties agree Trien made the mortgage payments until he filed for bankruptcy in August 2019.

## B. Victor and Zenaida purchase the Tenaha Home in 1999

On August 8, 1999, Victor and Zenaida Diaz signed a contract to purchase the Tenaha Home for $67,000 from John H. Trien, Harold Wright, and Mary Wright. The terms included a $2,100 down payment with Trien financing the remaining $64,900.:

> SELLER FINANCING: A promissory note from Buyer to Seller of $64.900.00, bearing 7.9 % interest per annum, secured by vendor's and deed of trust liens, in accordance with the terms and conditions set forth in the attached TREC Seller Financing Addendum.[2]

After closing, on September 11, 1999, Trien executed a "WRAP AROUND WARRANTY

---

[1] The record does not contain a copy of the 1996 wrap-around mortgage.

[2] The record does not contain a copy of the financing addendum.

DEED WITH VENDOR'S LIEN" to Victor and Zenaida for $10 and a $64,900 promissory note secured by an express vendor's lien in which Trien retained superior title to the home. The record does not contain a copy of the 1999 promissory note Victor and Zenaida signed.

On the same date, Victor and Zenaida, as grantors, executed a "WRAP AROUND DEED OF TRUST" to Trustee, Robert L. Reinhardt, listing Trien as the beneficiary. The deed of trust reflected that Victor and Zenaida signed a $64,900 promissory note, with an 8% interest rate, payable to Trien in monthly principal and interest payments of $480 beginning September 1, 1999, until paid in full. The wrap-around deed provided, "unpaid Principal and Interest shall bear the maximum interest rate allowed by laws per annum from maturity until paid and contains the usual provision for 10% attorney fees."

The 1999 deed of trust included a provision stating that if Victor and Zenaida "default[ed] on the Note or fail[ed] to perform any of [their] obligations, . . . and the default continues after [Trien] gives notice of the default and the time within which it must be cured, as may be required by law or written agreement," Trien had the right to "declare the unpaid principal balance and earned interest on the Note immediately due." Trien could then request the trustee to foreclose the lien and give notice of a foreclosure sale to the Diazes in accordance with the Texas Property Code.

The 1999 deed of trust also reflected the existing vendor's lien retained in favor of Charter Mortgage to secure the Wrights' mortgage payments, which payments Trien was responsible for continuing to make after the 1999 conveyance.

### C. Victor and Zenaida convey the Tenaha Home to their daughter and she conveys it back to Zenaida

On March 14, 2006, Victor and Zenaida executed a "WRAP AROUND WARRANTY DEED W/VENDOR'S LIEN" to their daughter, Marina B. Diaz, along with a $97,105.86 promissory note signed by Victor and Zenaida payable to John Trien Realty Inc., a Texas

Corporation (John Trien Realty) and secured by "a Vendor Lien expressly retained herein below, further and additionally secured by a Deed of Trust to Robert L. Reinhardt, Trustee for the benefit of the note holder." The record does not contain a copy of the 2006 promissory note Victor and Zenaida signed.

On the same date, Marina executed a "WRAP AROUND DEED OF TRUST" naming Reinhardt as the trustee and John Trien Realty as the beneficiary. The deed referred to the promissory note Victor and Zenaida gave to John Trien Realty in the amount of $97,105.86 at 8% interest, requiring monthly principal and interest payments of $697 beginning April 1, 2006, until paid in full. It provided for an additional payment of $223 per month "for escrow[,] making a total payment of $920.00" per month. The deed of trust reflected the vendor's lien retained in favor of Charter Mortgage, as referenced in the 1999 deed of trust.

Over nine months later, on December 28, 2006, Marina executed a "WRAP AROUND WARRANTY DEED WITH VENDOR'S LIEN" to Zenaida, conveying the Tenaha Home in consideration of $10 and a $97,105.86 promissory note signed by Marina as the grantor and payable to John Trien as the grantee. The wrap-around deed reflected that the promissory note was "secured by a Vendor's Lien, expressly retained herein below, further and additionally secured by a Deed of Trust to Robert L. Reinhardt, Trustee for the benefit of the note holder." Neither the promissory note signed by Marina nor the deed of trust to Reinhardt are in the record.

**D. Trien declares bankruptcy and the Bank's vendor lien goes into default**

The parties appear to agree that Trien made payments on the Bank of America mortgage until April 2019. On June 25, 2019, Bank of America notified the Wrights that they were in default, that the monthly payment of $657.85 had not been paid for May and June, and that the total amount needed to bring the account current, including late charges was $1,315.70. Trien filed for

bankruptcy shortly thereafter in August 2019.

It appears that Zenaida communicated with the Wrights' attorney, Robert Skipworth, regarding Trien's failure to make the Bank of America mortgage payment. In response, Skipworth informed Zenaida, in a letter dated October 10, 2019, that Trien was responsible for making those payments and the Wrights did not intend to pay off the mortgage. Skipworth, who later represented Miranda in the trial court proceedings against the Diazes, apprised Zenaida of his belief that Trien was not making the payments to the bank and suggested she stop making those payments to Trien "because he is not using the money for the purposes for which it was intended to be used."

### E. Miranda purchases the "notes" on the Tenaha Home

Sometime in October 2021, the bankruptcy trustee in Trien's bankruptcy proceeding offered Miranda the opportunity to purchase a group of 12–14 properties owned by Trien, to include notes on the homes, for $200,000. Miranda paid $54,000 separately to purchase the note on the Tenaha Home. The same month, after learning that Bank of America intended to foreclose on its superior lien on the Tenaha Home, Miranda paid Bank of America the remaining amount owed—$26,509.

## II. PROCEDURAL BACKGROUND

### A. Miranda's lawsuit

Believing Zenaida was in default on the note he purchased from the bankruptcy trustee on the Tenaha Home, Miranda attempted to negotiate with Zenaida to resolve the alleged outstanding deficiency. When his attempts failed, he filed the present lawsuit naming Victor, Zenaida, and Marina on December 16, 2021, shortly after Trien's bankruptcy proceeding was dismissed. In his lawsuit, he chronicled the above-described transactions, beginning with Trien conveying the Tenaha Home to Victor and Zenaida in 1999, in which Trien retained a vendor's lien, and ending

with Marina conveying the home to Zenaida in December 2006. Miranda alleged he was the current owner of the "note and Vendor's Lien" against the Tenaha Home. Alleging "[n]o payments have been made on the Promissory Note," and that "[c]urrently, there is due and owing on the Promissory Note the sum of $107,558.08," he was suing to recover that sum together with attorney's fees, rescind the vendor's lien, and "regain possession" of the property.

In January 2022, the Diazes each filed separate pro se answers, in which they generally denied the allegations and raised the affirmative defenses of payment and improper notice.

### B. Miranda moves for summary judgment

Miranda filed a motion for summary judgment in May 2022, alleging the undisputed evidence supported his claim to "foreclose the deed of trust lien and cancel the vendor's lien that is contained in the deeds of conveyance from John Trien to Victor Diaz and Zenaida Diaz," allowing him to "take possession of the property." In his motion, Miranda referred solely to Victor and Zenaida's 1999 purchase of the Tenaha Home and the promissory note they signed at that time, alleging "the Defendants have never made regular payments and have failed to pay many payments," and "[a]s of January 1, 2022, $107,558.08 was due and owing." In support, Miranda attached an affidavit from John Trien stating he kept records of all payments made on the house, Zenaida owed $107,558.08 as of January 2022, and she had not made any payments after that time.[3]

The Diazes opposed the motion, submitting what they characterized as an "affidavit" from Zenaida, in which she asserted the Diazes had been making regular payments to Trien and/or his real estate companies since they purchased the home in 1999. Zenaida maintained she had "original receipts" of payments made totaling $115,225.67 and attached as an exhibit written documentation

---

[3] Miranda did not introduce Trien's affidavit at trial, nor did he present Trien as a witness at trial.

of the various payments she made to Trien over the years, including receipts and copies of checks. Zenaida stated, however, that "many times" she made payments in Trien's office and his office staff "would forget to get [her] receipt." She claimed that when she would later contact the office to ask for a receipt, they would tell her not to worry as they had her payment records in the office.

Zenaida attached several other exhibits to her "affidavit," including a statement from Trien's office manager dated July 28, 2014, certifying that Zenaida was "presently making her mortgage payment to this office in the amount of $761.00 per month"; a letter dated August 2018 from trustee Robert Reinhardt informing her that she owed $39,000 on her note to Trien; and an October 2019 letter from attorney Skipworth advising her not to make any additional payments to Trien.

Zenaida also recalled that at some point after Trien declared bankruptcy, she learned of Bank of America's intent to foreclose on its lien. She provided Trien with a $25,000 check in August 2021 with the understanding he would pay Bank of America to avoid the foreclosure. Zenaida said Trien advised her to make the check out to "Mango Soto Corp," which he told her was one of his real estate companies. She attached a copy of cashier's check made out to that company and provided it to Trien. The parties agree, however, that Trien did not make this payment to the Bank.

Miranda objected to Zenaida's affidavit and asked the court to strike it from the record, contending it was not signed or notarized and the "vast majority" of her statements consisted of hearsay. It does not appear that the trial court ruled on Miranda's objection, and after holding a hearing on Miranda's summary judgment motion in November 2022, the court denied the motion.

### C. Zenaida moves to dismiss the petition

In September 2022, the Diazes, still acting pro se, filed a motion to dismiss Miranda's

7

lawsuit, maintaining all payments had been made and Trien had "lied under oath" when he stated she had not paid in accordance with the note's terms. Her motion requested that all liens be "cleared" and that she be given title to the property. Zenaida asserted she was entitled to compensation for "overpayment" and damages for defamation, harassment, and emotional distress, among other things. It appears that the trial court denied the motion in November 2022, referring to it as a motion for summary judgment.

## D. The Diazes file a "counterclaim" seeking damages

In September 2022, the Diazes also filed a pro se "counterclaim" against Ralph Miranda Realty, Trien, Trien's officer manager, and Mango Soto Corporation, requesting damages for "Defamation of Character, Harassment, Trauma, Anxiety, Emotional Distress, Pain and Suffering" as well as compensation for "overpayment" on the Tenaha Home note and to cancel "any liens" on the property. However, it does not appear that any of the entities the Diazes named in their pleading were ever served, and there is no indication they made an appearance in the case.[4] Although we note that Miranda filed an answer to the counterclaim in his personal capacity, the record does not reflect that he filed a response on behalf of "Ralph Miranda Realty."

## E. The bench trial

The trial court held a bench trial in July 2023 at which both parties were represented by counsel.

### (1) Miranda's trial testimony

At trial, Miranda testified to his purchase of "the note" Trien held on the Tenaha Home from the bankruptcy trustee for $54,000 in October 2021.[5] He acknowledged that when he

---

[4] Rule 38(a) provides that, "[a]t any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him." Tex. R. Civ. P. 38 (a).
[5] Miranda did not introduce copies of any of the documents relative to his purchase.

purchased the note, he was not aware of how much was owing on it or that Bank of America had a vendor's lien on the property, stating he likely would not have purchased the property had he known. When he learned Bank of America intended to foreclose on the property, he made a $26,509 payment to Bank of America to protect his investment.[6]

According to Miranda, because he believed the Diazes were behind in their payments on the note, he attempted to speak with Zenaida about the situation, but she declined to engage in negotiations, informing him that "she paid" for the house and it was hers. He testified that he believed his attorney had sent the Diazes foreclosure notices prior to filing his lawsuit, but he did not introduce the notices in evidence.

Miranda introduced the wrap-around deeds of trust and warranty deeds with vendors liens the Diazes and Trien had executed, beginning with the 1999 documents and ending with those executed in 2006. However, in his testimony, he focused solely on the promissory note referenced in the 1999 deeds in which Victor and Zenaida had agreed to pay Trien $64,900, mistakenly stating that the deeds reflected they were obligated to pay $687 a month, rather than $480. And based on that monthly payment, he calculated that the Diazes should have paid $186,000 over the course of the 24 years they lived in the Tenaha Home prior to trial. Miranda further calculated, based on the records Zenaida provided during discovery and later introduced at trial, that the Diazes had only paid $79,000—if they were not given credit for the $25,000 check to Trien—which he believed they should not be given. He testified that he therefore believed the Diazes still owed $106,000 (presumably meaning $107,000) on the original note. However, at other times, Miranda testified he believed the Diazes owed $134,000 on the note if the $25,000 check was included in their

---

[6] Miranda introduced a bank statement demonstrating that he wrote a $26,509 check to Bank of America on October 29, 2021.

payments, but $159,000 if it was not.

### (2) Susan Bustamante's trial testimony

Susan Bustamante testified that she worked for Miranda's nephew and had reviewed the receipts and other documents that Zenaida provided to Miranda during discovery.[7] After reviewing the documents, Bustamante calculated the amounts paid differently than Miranda, concluding the Diazes had paid Trien a total of $85,938 since 1999, assuming that the $25,000 payment to Trien's corporation was not included, but $110,938 if it was (mistakenly referring to the total as $110,930 in her trial testimony). Bustamante provided a chart, which was introduced without objection, listing the following documented payments the Diazes had made to Trien:

| | |
|---|---|
| 1999 | $6560 (to include the down payment of $2100) |
| 2000 | $5490 |
| 2001 | $5365 |
| 2002 | $2109 |
| 2003 | $0 |
| 2004 | $0 |
| 2005 | $0 |
| 2006 | $2991 |
| 2007 | $15,293 |
| 2008 | $3108 |
| 2009 | $7759 |
| 2010 | $861 |
| 2011 | $0 |
| 2012 | $0 |
| 2013 | $0 |
| 2014 | $761 |
| 2015 | $20,861 |
| 2016 | $7570 |
| 2017 | $800 |
| 2018 | $1610 |
| 2019 | $4800 |
| 2020 | $25,000 (paid to Mango Soto Corp.) |

On cross-examination, Bustamante acknowledged it was possible Zenaida had made other

---

[7] Bustamante did not explain her background or qualifications, nor did she explain the capacity in which she worked for the nephew.

payments, and she did not contact Trien to determine whether the receipts she had been provided were accurate and/or inclusive.

### (3) Zenaida's trial testimony

Miranda called Zenaida as an adverse witness at trial, and she testified as follows. She and Trien had been good friends, and she purchased the Tenaha Home from him in September 1999 with a wrap-around mortgage in exchange for a $64,900 promissory note. She was required to make monthly payments on the note. However, after she was diagnosed with cancer in 2006 and believed she might pass away, she asked for Trien's help to transfer the property to her daughter, Marina. For reasons unknown to her, Trien required Marina to sign a promissory note of $97,105.86 with monthly payments of $920 in exchange for the conveyance. Zenaida recalled that when Marina conveyed the property back to her through a wrap-around deed of trust on December 28, 2006, she agreed to a promissory note payable to Trien in that same amount.

Zenaida explained that she regularly made payments to Trien beginning in 1999 in varying amounts, with Trien's office informing her of varying amounts she was required to pay each month. There were times when Trien would verbally inform her that she was behind in her payments, and she would always respond by making up any deficit that she owed. Zenaida expressly denied that Trien ever sent her any written foreclosure notices.[8]

Zenaida introduced the documentation of payments she had made to Trien beginning in 1999, which she had supplied to Miranda during discovery and which Bustamante had used to construct her payment chart. Although Zenaida calculated that the total of payments documented in writing she had made was $110,502.21, she agreed with Bustamante's calculation that she had

---

[8] At one point, Zenaida indicated she may have received one notice of foreclosure from Trien on an undisclosed date, but she then appeared to correct herself, stating the notices she received were from Bank of America regarding the Wrights' mortgage.

produced written documentation of payments totaling $110,938. However, when asked why Bustamante's payment chart indicated that there were months, if not years, during which she did not make any payments to Trien, she provided two explanations. First, she explained, given their friendship and her trust in Trien, she would often pay him cash without getting a receipt based on his and/or his staff's representation that they would record her payment in her file. She estimated she had made anywhere from $40,000 to 50,000 in payments for which she was not given a receipt, and she had given him cash payments of $850 at least 20 times during an unspecified period of time. After being diagnosed with cancer in 2006, Trien, aware of her condition, allowed her to skip payments for six months. During that six-month period, she would still go to his office "a lot of times" to make payments for which she was not given receipts.

Because Trien never gave her any statements reflecting her loan balance, she contacted his office in 2018 to determine how much she owed. Thereafter, she received a letter dated August 8, 2018, from Robert Reinhardt, the trustee on the various deeds of trust, stating her loan balance was $39,000.[9] Zenaida proffered Reinhardt's letter without objection.

Zenaida also testified that she gave Trien a $25,000 cashier's check in February 2020 with the understanding he would pay off the Bank of America mortgage to avoid foreclosure. However, Trien informed her that because he was in bankruptcy and everyone was "after [him]," she should make the check to "Mango Soto Corp," which Zenaida believed was one of Trien's real estate companies. She introduced the check dated February 14, 2020, without objection.

When asked by Miranda's current counsel (Skipworth) if she recalled receiving his October

---

[9] At trial, Miranda's attorney asked Zenaida if she had received a letter from Reinhardt stating that she owed $107,000, but Zenaida stated she did not recall receiving the letter. Miranda's attorney sought to introduce the letter in evidence, but the trial court sustained Zenaida's attorney's objection that it was not properly authenticated. The letter was therefore not admitted.

2019 letter (when he was representing the Wrights) advising her "not to pay this man," i.e., Trien, Zenaida did not deny receiving the letter. She explained that she nevertheless gave Trien the check based on what she believed to be the Bank's instructions. Zenaida never learned what Trien did with the $25,000 check, and when she later attempted to contact him to find out—as well as to obtain receipts for the other payments she had made to him for which he had failed to give her receipts—she was never able to speak with him.

### (4) Closing arguments

In closing argument, Miranda's attorney argued the evidence established that $107,000 was "due and owing on the promissory note" Miranda had purchased from the bankruptcy trustee. He clarified that Miranda was not seeking to recoup that amount from Zenaida; instead, he was seeking to rescind the vendor's lien and gain possession of the property. In response, Zenaida's attorney disputed that any balance was owed on the note, but if a balance was owed, it would be $14,000 which represented the $39,000 amount that Reinhardt told Zenaida she owed in August 2018, minus the $25,000 she later tendered to Trien to pay off Bank of America vendor's lien. The Diazes' attorney also argued Miranda failed to provide them with notice of their alleged default and an opportunity to cure the same prior to filing his lawsuit, as required by the parties' deeds and the Texas Property Code. The Diazes did not seek relief on their counterclaim.

### F. Post-trial briefs

Following trial, Miranda filed a "trial brief" in which he again asserted he was entitled to rescind his vendor's lien. But for the first time, he claimed Zenaida had defaulted on the promissory note she signed in December of 2006 for $97,105.86, rather than the 1999 promissory note Victor and Zenaida signed in 1999 for $64,900. And he stated he was seeking to rescind the vendor's lien contained in the December 2006 wrap-around warranty deed with vendor's lien in which Marina

13

had conveyed the Tenaha Home to Zenaida.

Zenaida thereafter filed a post-trial "memorandum" in which she argued Miranda had not established she was in default on the loan, maintaining that the "entire debt" on the note had been paid. In the alternative, she argued that, at most, she owed $15,000 on the note and was entitled to a judgment in that amount.

## G. The court's final judgment

On July 31, 2023, the trial court issued a Final Judgment denying Miranda's request to rescind the vendor's lien and gain possession of the property. In addition, the trial court stated it was granting the Diazes' "affirmative defense of Plea of Payment" but did not rule on the Diazes' counterclaim. The court referred to Zenaida's Exhibit 6, the letter Reinhart sent to Zenaida in October 2018 stating the loan balance was $39,000 and found that taking into account the $25,000 payment that Zenaida made to Trien to pay off the Bank of America loan, "all payments on [the Tenaha Home] have been paid" by the Diazes, "except for the amount of $1509.00," which represented the difference between the amount Miranda paid to Bank of America to avoid foreclosure ($26,509) and the amount the Diazes paid to the bank through Mango Soto ($25,000). The court ordered Zenaida to pay Miranda $1,509 and stated that thereafter, "nothing further will be due and owing" on the home.

## H. Miranda's post-trial pleadings

On August 3, 2023, Miranda requested findings of facts and conclusions of law. On August 28, 2023, Miranda filed a notice of past due findings. No findings of fact or conclusions of law are contained in the clerk's record.

On August 30, 2023, Miranda filed a motion for new trial, arguing the trial court erred by denying his request to rescind his vendor's lien and granting the Diazes' affirmative defense of

payment. He argued the "overwhelming" evidence established that Zenaida still owed $134,000 on the 1999 note, "even after giving her credit for [the] $25,000.00" she paid Trien's real estate company in 2020, while still maintaining that such credit should not be given. Miranda further argued the trial court erred by "ignor[ing] the transfers of the properties from Victor and Zenaida Diaz to Marina in 2006 when the purchase price was increased substantially."

The trial court held a hearing on Miranda's motion for new trial at which Miranda's attorney argued the "uncontroverted evidence is that [Zenaida] owes $134,000 on the note," apparently referring to the 1999 promissory note.[10] He also disagreed with the court's decision to give Zenaida credit for the $25,000 check to the Mango Soto Corp., arguing there was no basis in the record for doing so. Zenaida's attorney retorted that there was sufficient evidence to support a finding that the note had been paid off, including Zenaida's testimony, and the trial court was to resolve any credibility issues with respect to her testimony.

The trial court did not rule on Miranda's motion for new trial, and it was overruled by operation of law. Miranda appealed from the trial court's final judgment. Zenaida did not file a cross-appeal.

## III. ISSUES ON APPEAL

Miranda raised three issues on appeal. In Issue One, he contends he conclusively established he was the holder of the vendor's lien and the Diazes were in default on the note, giving him the right to rescind the lien. In Issue Two, Miranda argues the evidence was legally and factually insufficient to support the trial court's finding on the Diazes' affirmative defense of payment that the note was paid in full, with the exception of the $1,509 the court ordered Zenaida

---

[10] At the hearing, the trial court also heard Zenaida's counsel motion to withdraw from the case and later granted that motion.

to pay. As a subcategory of Issues One and Two, Miranda contends, for the first time on appeal, Zenaida was barred by Rule 95 of the Texas Rules of Civil Procedure from presenting any of her own evidence at trial regarding her proof of payments and she could only rely on the evidence he presented at trial on that issue. Alternatively, Miranda argues that even if Zenaida's evidence was admissible, it was insufficient to support the trial court's judgment that she was not in default or that she paid off the note. Finally, in Issue Three, Miranda contends the trial court was required to grant his request to make findings of fact and conclusions of law to support its judgment, and he was harmed by the trial court's failure to do so.

## IV. THE TRIAL COURT'S IMPLIED FINDING THAT MIRANDA WAS NOT ENTITLED TO RESCIND THE LIEN AND GAIN POSSESSION OF THE TENAHA HOME

In his first issue, Miranda maintains the trial court erred in refusing his request to rescind his vendor's lien, asserting the "undisputed evidence establishes as a matter of law [his] right to recover title and possession of the property as the holder of a vendor's lien." We disagree.

### A. Standard of review

Because Miranda is attacking the legal sufficiency of an adverse finding on which he has the burden of proof, he "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241–42 (Tex. 2001). "In reviewing a 'matter of law' challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law." *Id*. Miranda's issue should be sustained only if the record conclusively establishes as a matter of law that the Diazes were in default and Miranda had the right to recover title and possession of the property as the holder of a vendor's lien. *See Meyers v. 8007 Burnet Holdings, LLC*, 600 S.W.3d 412, 424–25 (Tex. App.—

16

El Paso 2020, pet. denied) (explaining that the point of error should be sustained only if the contrary proposition is conclusively established as a matter of law).

## B. Applicable law

A purchase-money vendor's lien is "a charge imposed by contract to secure payment of the purchase price of real property." *Benbrook Econ. Dev. Corp. v. Nat'l Bank of Tex.*, 644 S.W.3d 871, 875 (Tex. App.—Fort Worth 2022, no pet.) (citing *Glenn v. Lucas*, 376 S.W.3d 268, 275 (Tex. App.—Texarkana 2012, no pet.)). It is well-established that "a deed in which an express vendor's lien is reserved to secure the payment of purchase money will, as between the parties and their privies, be treated as an executory contract of sale under which, until the purchase money is paid, the superior legal title remains in the vendor and the vendee acquires an equitable right to obtain the legal title by payment of the purchase money." *State v. Forest Lawn Lot Owners Ass'n*, 254 S.W.2d 87, 91 (Tex. 1953). In other words, when "an express vendor's lien is retained to secure unpaid purchase money, superior legal title remains in the vendor until the purchase money is paid." *See Lusk v. Mintz*, 625 S.W.2d 774, 775 (Tex. App.—Houston [14th Dist.] 1981, no writ); *see also Walton v. First Nat. Bank of Trenton, Trenton, Tex.*, 956 S.W.2d 647, 651–52 (Tex. App.—Texarkana 1997, pet. denied) (recognizing that where bank held an express vendor's lien coupled with a deed of trust on the property in question to secure the unpaid purchase price, it held superior title to the property).

A vendor holding an express vendor's lien has his "choice of remedies on the vendee's default," and he "may sue for his money, he may rescind the contract and take possession of the property, or he may sue to recover title and possession." *Glenn*, 376 S.W.3d at 275 (citing *Walton*, 956 S.W.2d at 652; *Lusk*, 625 S.W.2d at 775–76); *see also Whiteside v. Bell*, 347 S.W.2d 568, 570 (1961) (recognizing that a holder of a vendor's lien had superior title giving the vendor the "right

to rescind the conveyance upon default by the defendants") (quoting *Maupin v. Chaney*, 163 S.W.2d 380, 384 (1942)).

### C. Whether Miranda met his burden of establishing his right to rescind the lien

Miranda contends he established that he had a valid vendor's lien on the Tenaha Home and points out that the Diazes do not dispute its validity. He therefore maintains he had the right, as a matter of law, to rescind the lien and regain possession of the property upon their default. While we agree that the evidence supported a determination that Miranda had a valid vendor's lien, the question before us is whether the evidence conclusively established that the Diazes were in default on the note.

The term default is not defined in any of the parties' loan documents. We therefore look to its generally accepted meaning. *See Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, 468 S.W.3d 557, 566–67 (Tex. App.—San Antonio 2014, pet. denied) (citing *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007) (examining a term's meaning in an insurance policy and opining that "[t]erms that are not defined in a [contract] are given their generally accepted or commonly understood meaning")). "Default" is defined by Black's Law Dictionary as "the omission or failure to perform a legal or contractual duty." *Id.* (citing Black's Law Dictionary 449 (8th ed. 2004); *Jackson T. Fulgham Co. v. Stewart Title Guar. Co.*, 649 S.W.2d 128, 131 (Tex. App.—Dallas 1983, writ ref'd n.r.e.)). Thus, a "default may consist of the failure to make a payment on the loan within a specified period or may be the breach of a covenant, representation, or warranty or the occurrence or nonoccurrence of some event." *Id.*

#### (1) The confusion over which promissory note was at issue

The first hurdle we face in analyzing whether the evidence supports the trial court's implied finding that the Diazes were not in default is determining what note governs the Diazes' obligation.

18

As explained above, the Diazes signed two, if not three, different promissory notes on the Tenaha Home, beginning in September 1999 and ending in December 2006, based on three separate conveyances of the property in which either Trien or his real estate company retained vendor's liens.[11] But both before and during trial, Miranda focused solely on Victor and Zenaida's obligations under the September 1999 promissory note relative to the first conveyance. In his petition, Miranda alleged he was the holder of the Vendor's Lien that was retained in the deed from Trien to Victor and Zenaida Diaz as recorded in the 1999 "Wrap Around Warranty Deed with Vendor's Lien." In his summary judgment motion, as well as at trial, Miranda again referred solely to the 1999 vendor's lien, claiming Victor and Zenaida had not met their obligation to pay on the $64,9000 promissory note entered in the "initial note" from 1999, the genesis of that lien.

In his petition, Miranda alleged that after Victor and Zenaida transferred the property to Marina in March 2006, the 2006 deed "retained the Vendor's Lien that was originally retained in the first Deed." But the only Vendor's Lien that was retained in the 2006 deed was the "Vendor's Lien retained in favor of [Bank of America] in [the] deed dated 1/26/1996." Miranda does not address this issue in his appeal.

On appeal, Miranda argues that the 2006 promissory note Victor and Zenaida signed in March 2006 for $97,105.86 when they conveyed the property to Marina could be considered a

---

[11] First, the record reflects that Trien, in his individual capacity, retained a vendor's lien when he conveyed the Tenaha Home to Victor and Zenaida in September 1999, based on a promissory note Victor and Zenaida gave him in the amount of $64,900. However, in March 2006, Victor and Zenaida transferred the Tenaha Home to their daughter, Marina, with Trien's permission, and the wrap around deed with vendor's lien in that transaction reflects that Trien's realty company, John Trien Realty Inc, a Texas Corporation, received a vendor's lien based on the following language: "in consideration of [the] execution of a promissory note in the original amount of $97,105.86 signed by Grantors herein [previously identified as Victor and Zenaida] and payable to *JOHN TRIEN REALTY INC, A TEXAS CORPORATION,* secured [by] a Vendor Lien, expressly retained herein below." (emphasis original). As explained above, at the end of December 2006, Marina executed a wrap around warranty deed with vendor's lien to Zenaida and promissory note payable to Trien as grantee.

19

refinancing of the 1999 promissory note.[12] Miranda further recognizes that if so, Zenaida's payment obligations did not begin until December 2006 when Marina conveyed the property back to Zenaida. In other words, Miranda now recognizes the possibility that the Diazes' obligations started anew in 2006 when they signed the second promissory note for $97,105.86. And he now contends Zenaida was in default on the 2006 note.

Miranda, however, did not posit the idea that the 2006 note might be the relevant note upon which Zenaida had defaulted until his post-trial brief. Adding to the confusion, in his brief on appeal, Miranda at times maintains that the Diazes were in default on the 1999 $64,900 promissory note, while at other times argues the Diazes were in default on the 2006 promissory note, attaching amortization tables for both.

We will not consider on appeal Miranda's newly raised theory that the Diazes were in default on the 2006 note, as it was not raised at trial. *See generally Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015) (recognizing that "[p]arties are restricted on appeal to the theory on which the case was tried"). The very fact that Miranda now appears to acknowledge the possibility that the 1999 note was refinanced and Zenaida's payments started anew in 2006 illustrates the confusion regarding the Diazes' obligations, whether they were in default on those obligations, and whether Miranda was entitled to rescind his vendor's lien (or even which vendor's lien was at issue). Accordingly, as Miranda failed to establish the Diazes' precise obligations, the trial court could have reasonably found that Miranda did not meet his burden of establishing that the Diazes were in default on their obligation denied his request to rescind his vendor's lien on this basis alone.

---

[12] The 1999 deed provided, "This Note does contain the DUE ON SALE CLAUSE upon conveyance of the property." Therefore, it appears that Zenaida and Victor either paid off the balance owed on the 1999 note before they transferred the property to Marina or refinanced the amount in the new promissory note.

### (2)  Miranda's failure to establish a default on the 1999 note

Even if we were to assume that the 1999 note had not been refinanced and the Diazes were still obligated to pay on that note—as Miranda argued at trial—the evidence did not conclusively establish as a matter of law that the Diazes were in default on the note.

### (a)  Evidence of missed payments standing alone did not establish a default

As a preliminary matter, Miranda appears to be arguing at times that he had the right to rescind his vendor's lien because the Diazes had allegedly missed multiple payments over the 22 years *before* he purchased the note on the Tenaha Home. But the fact that the Diazes may have missed payments in the past does not, standing alone, establish they were in default at the time Miranda attempted to rescind his lien. The record reflects that, although the Diazes did miss payments over the years, Trien would later accept large sums of money from them after the fact and never declared them in default.[13] A vendor may, by his actions in accepting late payments, waive his right to rescind his vendor's lien or foreclose on a deed of trust. *See Schuhardt*, 468 S.W.3d at 567 (citing *Ford Motor Credit Co. v. Washington*, 573 S.W.2d 616, 618 (Tex. App.— Austin 1978, writ ref'd n.r.e.) (recognizing that a secured party's acceptance of payments ten days after the due date on a promissory note waived the secured party's right to declare default when debtor made another similarly late payment ten days after the due date); *Vaughan v. Crown Plumb. & Sewer Serv., Inc.*, 523 S.W.2d 72, 75 (Tex. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (recognizing that regularly accepting late payments may constitute a waiver of the note holder's right to declare a default for late payments)); *see also Bodiford v. Parker*, 651 S.W.2d 338, 339– 40 (Tex. App.—Fort Worth 1983, no writ) (recognizing that there may be an "implied waiver of

---

[13] At trial, Miranda testified to having recalled seeing two foreclosure notices Trien sent to Zenaida in 2019 and 2020, which he stated were in the "file" he received when he purchased the property from the bankruptcy trustee. However, he did not introduce either notice.

[the] requirement of punctual payments by acceptance of payments made past the due date" and a consequent waiver of the right to declare a default for subsequent late payments).

Accordingly, Miranda was required to do more than simply point to missed payments to establish the Diazes were in default at the time he sought to rescind his vendor's lien.

### (b) Whether Rule 95 prohibited the Diazes from producing evidence in support of their affirmative defense of payment

In determining whether the trial court correctly found that Miranda did not meet his burden of establishing that the Diazes were in default on the 1999 promissory note, we first address what evidence the trial court was entitled to rely upon. Miranda argues for the first time on appeal that we should not consider Zenaida's testimony or her trial evidence of the payments she made to Trien based on the Diazes' failure to properly plead their affirmative defense of payment. We disagree.

The affirmative defense of payment is governed by three rules. First, Rule 94 of the Texas Rules of Civil Procedure provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively" various affirmative defenses, included "payment . . . and any other matter constituting an avoidance or affirmative defense." Tex. R. Civ. P. 94. Rule 94's purpose is to "give the opposing party notice of the defensive issue to be tried," thus any defensive issues must be "pleaded" so they are "raised before trial." *See MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136–37 (Tex. 2014). The failure to plead an affirmative defense in any "responsive pleading" constitutes a waiver of the defense. *See Roth v. JPMorgan Chase Bank, N.A.*, 439 S.W.3d 508, 513 (Tex. App.—El Paso 2014, no pet.). As set forth above, the Diazes affirmatively pleaded payment as an affirmative defense in their answer to Miranda's petition, and Miranda was therefore on notice of their defense prior to trial. Accordingly, the requirements of Rule 94 were met.

22

Second, Rule 95 places an additional burden on a defendant raising the affirmative defense of payment to provide an accounting of their payments. Rule 95 provides, "When a defendant shall desire to prove payment, he shall file with his plea an account stating distinctly the nature of such payment, and the several items thereof; failing to do so, he shall not be allowed to prove the same, unless it be so plainly and particularly described in the plea as to give the plaintiff full notice of the character thereof." Tex. R. Civ. P. 95 Miranda correctly points out that Rule 95's requirements are mandatory. Therefore, when a defendant does not comply with Rule 95, the defendant's affirmative defense will be waived, and he may be precluded from presenting evidence of his defense in response to either a motion for summary judgment or at trial. *See, e.g.*, *Rea v. Sunbelt Sav., FSB, Dallas, Tex.*, 822 S.W.2d 370, 372 (Tex. App.—Dallas 1991, no writ) (recognizing that "[a]bsence of a proper plea of payment renders evidence as to payment inadmissible") (citing *Twin City Bowling Lanes, Inc. v. C.I.T. Corp.*, 376 S.W.2d 94, 96 (Tex. App.—Fort Worth 1964, no writ)); *see also F-Star Socorro*, 281 S.W.3d at 108 (where defendant filed only a general denial and did not comply with either Rule 94 or 95 in any responsive pleading defendant "waived its payment and other offset defenses"). The Diazes did not file an accounting with their answers to Miranda's petition. Based on this failure, Miranda contends the Diazes waived their right to raise their affirmative defense of payment at trial. In turn, he argues that the only evidence the trial court could rely upon to establish payment history was the evidence he produced at trial, i.e., his own testimony and Bustamante's chart of payments.

To determine whether the Diazes' affirmative defense of payment was waived, we consider a third rule: the rule pertaining to trial by consent. Rule 67 provides, in part, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tex. R. Civ. P. 67. The Texas Supreme

23

Court has applied this rule to situations in which an unpleaded affirmative defense has been tried by consent both in a summary judgment proceeding and during trial. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 494 (Tex. 1991) (holding that an unpleaded affirmative defense of payment may serve as the basis for a trial court's order granting summary judgment when the issue is raised in a summary judgment motion and the opposing party does not object to litigating the defense prior to rendition of judgment); *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 443 (Tex. 1993) (observing that an unpleaded issue may be tried by consent in accordance with Rule 67); *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009) (recognizing that under Rule 67, unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings).

In examining whether the Diazes' affirmative defense of payment was tried by consent, we recognize that "an issue is not tried by consent merely because evidence regarding it is admitted." *See Bos v. Smith*, 556 S.W.3d 293, 306–07 (Tex. 2018). Instead, "[w]e must examine the record not for evidence of the issue, but rather for evidence of *trial* of the issue." *Id.* Here, we conclude that the defense of payment was tried by consent because the evidence of payment was developed at trial (as well as at the summary judgment stage) without objection from Miranda, who understood the issue of payment was being contested. *Ingram*, 288 S.W.3d at 893 ("When both parties present evidence on an issue and the issue is developed during trial without objection, any defects in the pleadings are cured at trial, and the defects are waived."); *Sage St. Associates*, 863 S.W.2d at 445 (recognizing that the issue of contract's ambiguity was tried by consent where several witnesses testified on the issue, and the record reflects that "both sides vigorously advanced their respective positions at trial").

24

In fact, Miranda himself affirmatively raised the issue of whether payments were made in his motion for summary judgment, alleging he was entitled to judgment on his pleadings because the Diazes "have never made regular payments and have failed to pay many payments." The Diazes responded by providing a detailed accounting of the payments they had made to Trien beginning in 1999 for which they had written documentation, including the $25,000 cashier's check made out to Trien's real estate company. Rather than objecting to the Diazes raising their defense of payment due to pleading deficiencies, Miranda proceeded to litigate the issue of whether the Diazes had made sufficient payments to avoid default.[14] The Diazes' defense was thus placed "squarely before the trial and appellate courts." *Roberts v. Wells Fargo Bank, N.A.*, 406 S.W.3d 702, 707 (Tex. App.—El Paso 2013, no pet.) (citing *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006)); *see also Gilbert v. Kalman*, No. 08-22-00092-CV, 2023 WL 3735576, at *4–5 (Tex. App.—El Paso May 31, 2023, no pet.) (mem. op.) (recognizing that defendant did not waive the ability to raise affirmative defense of payment despite Rule 95 pleading deficiencies where plaintiff was on full notice of the defense and the defense was the central issue litigated at trial).

Because Miranda failed to object to the improperly pleaded affirmative defense of payment in the trial court, and instead tried the defense by consent, he may not complain for the first time on appeal that the defense was waived. *See Godoy v. Wells Fargo Bank, N.A.*, 575 S.W.3d 531, 537 (Tex. 2019) (holding that plaintiff could not complain for first time on appeal that defendant failed to plead an affirmative defense as required by Rule 94 where defendant relied on the defense in its summary judgment motion without objection by the plaintiff); *Roark*, 813 S.W.2d at 495 (recognizing that a "party who allows an issue to be tried by consent and who fails to raise the lack

---

[14] As set forth above, Miranda objected to the unsworn and "unreliable" nature of Zenaida's affidavit that the Diazes filed in response to his motion for summary judgment, but he failed to object that the Diazes were raising an unpleaded affirmative defense in their response.

of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal").

Accordingly, the trial court was permitted to consider the evidence presented by the Diazes in determining whether Miranda had established his right to rescind his vendor's lien. We, too, consider their evidence in our analysis.

### D. The parties presented conflicting evidence on the issue of default

Reviewing the conflicting evidence proffered at trial, we conclude the record supports the court's implied finding that Miranda did not meet his burden of conclusively establishing as a matter of law that the Diazes were in default on the note and that he was entitled to rescind his vendor's lien and take possession of the property.

At trial, Miranda testified that, by his estimate, the Diazes should have paid $186,000 on the 1999 note up until the month of trial (July 2023). It is unclear how he reached that estimate or whether he relied on accurate data in doing so. Miranda's estimate was based on his belief that Victor and Zenaida were obligated to pay $687 per month to Trien on the 1999 note, beginning in September 1999. However, Miranda did not introduce the promissory note at trial; the only document in the record referencing the promissory note was the 1999 deed of trust, which recited that Victor and Zenaida were only obligated to make monthly principal and interest payments of $480 a month.[15] Thus, to the extent Miranda relied on faulty figures for calculating the amount Victor and Zenaida owed on the 1999 note, the trial court could have disregarded his calculation.

---

[15] Miranda further argues for the first time on appeal that "[t]he 1999 loan required Zenaida and Victor to pay Trien $480 a month for principal and interest, plus $235 a month in escrow," and that the "total monthly payment due [was] $715." In support, Miranda points to a letter dated September 7, 1999, that Trien sent to the Diazes, which Zenaida produced during discovery, stating the September 1999 payment was to be "paid on or before 9/15/1999 in the amount of $715.00." But the letter does not indicate that any portion of this payment was to be considered an escrow payment, nor does it reflect what the escrow payment would have included. In fact, the 1999 deed of trust stated that Victor and Zenaida were responsible for paying taxes and other assessments on the property without indicating that they were to pay the taxes through an escrow account. Thus, although the Diazes did initially make nine monthly payments of $715

26

Moreover, though the Diazes only produced written documentation that they had paid as much as $110,938 on the note (including the $25,000 check made out to Mango Corp.), Zenaida testified at trial that she made up to $50,000 in cash payments to Trien over the course of the 22 years the Diazes lived in the Tenaha Home before Miranda purchased the note. The chart of payments that Miranda himself introduced reflected that there were months, as well as years, that the Diazes made no payments without Trien declaring a default, and the trial court could have found Zenaida's testimony credible as to those undocumented payments. *See generally In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (recognizing that an appellate court must defer to the "trial court's resolution of underlying facts and to credibility determinations that may have affected its determination, and will not substitute our judgment for the trial court's"); *see also PetroSaudi Oil Services Ltd. v. Hartley*, 617 S.W.3d 116, 133 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (explaining that appellate court may not substitute its judgment for that of the factfinder or pass upon the credibility of witnesses, and "[i]f the evidence supports the implied fact findings, we must uphold the trial court's judgment on any legal theory supported by the findings").

The Diazes also introduced a copy of the October 2018 letter Reinhardt sent to Zenaida stating that her loan balance was $39,000. Zenaida presented evidence of documented payments of $4,800 that she made to Trien in 2019 as well as the payment of $25,000 she made to Trien's real estate corporation in 2020, which the trial court credited to her account. This left, at most, a remaining balance of $9,200 on the 1999 loan.

On appeal, however, Miranda disputes this method of calculating the Diazes' debt and the amount owed. In doing so, Miranda does not argue that Zenaida should not be given credit for the

---

to Trien, we cannot presume that any portions of those payments reflected an escrow payment in the absence of any evidence that this was the parties' agreement.

$25,000 payment to Trien. However, he does argue that the trial court should not have considered Reinhardt's letter in calculating the Diazes' indebtedness, claiming that Reinhardt "incorrectly" stated the balance owed at that time. But Miranda did not object to the admission of Reinhardt's letter on this or any other ground at trial, and he failed to present any evidence to dispute its validity or the accuracy of that balance.

Miranda further contends, for the first time on appeal, that Reinhardt's letter was "irrelevant" to the determination of whether the Diazes were in default, maintaining "there is only one way to correctly calculate the amortized balance owed" on the note—based on the 1999 note amortization table appended to his brief. Miranda urges this table correctly calculated that the Diazes owed $323,059.61 as of the day of trial based on the "undisputed evidence of payment dates and amounts" presented at trial and the applicable 8% interest rate. There are several reasons why we do not consider this table in our analysis.

First, as the Diazes point out, the table was not introduced in evidence at trial, and it therefore cannot be considered as part of the appellate record. *See Hogg v. Lynch, Chappell & Alsup, P.C.*, 480 S.W.3d 767, 773 (Tex. App.—El Paso 2015, no pet.) (recognizing that "[d]ocuments attached to a brief as an exhibit or appendix, but not appearing in the appellate record, cannot be considered on appellate review"). Miranda acknowledges that the amortization table was not introduced at trial, but he contends the table is only "a demonstrative of [the Diazes'] own evidence regarding payments made on their obligation to Trien (and later Miranda as holder) and application of simple mathematical computation to those payments based on the terms of the respective loans." He maintains we can use the amortization table to determine "unequivocally that [the Diazes] failed to satisfy their payment obligations to Miranda as holder of the deed of trust with vendor's lien."

In support, Miranda relies on our sister court's opinion in *Drake v. Holstead*, 757 S.W.2d 909, 911 (Tex. App.—Beaumont 1988, no writ), in which it held that the trial court erred in refusing to take "judicial notice of the indisputable results of a simple mathematical computation" relating to the speed at which two cars were traveling at the time they collided to assist the jury in determining who was at fault in the accident. But Miranda cites no authority for the proposition that an appellate court should take judicial notice of the results of such computations for the first time on appeal, particularly when no foundation has been laid for their reliability in the trial court.

In general, "an appellate court has the power to take judicial notice for the first time on appeal of adjudicative facts that are matters of public record and not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Cnty. of El Paso v. Navar*, 584 S.W.3d 73, 77–78 (Tex. App.—El Paso 2018, no pet.) (citing Tex. R. Evid. 201(b), (c); *Office of Public Utility Counsel v. Public Utility Comm'n of Texas*, 878 S.W.2d 598, 600 (Tex. 1994); *Taylor v. Margo*, 508 S.W.3d 12, 24 (Tex. App.—El Paso 2015, pet. denied)). However, an appellate court's power to take judicial notice of a fact on appeal is discretionary, and courts are generally reluctant to do so. *Id.* at 78 (citing *Hendee v. Dewhurst*, 228 S.W.3d 354, 377 (Tex. App.—Austin 2007, pet. denied)); *see also In re Estate of Hemsley*, 460 S.W.3d 629, 638–39 (Tex. App.—El Paso 2014, pet. denied) (recognizing that appellate courts are "reluctant to take judicial notice of matters which go to the merits of a dispute").

Here, although the amortization table may be based on "simple mathematical calculations," the data Miranda inputted into the table is not based on indisputable facts. To the contrary, the record is, at best, muddy as to the Diazes' obligations, what payments they made, and when those payments were made over the course of the 24 years leading up to the trial. Miranda's amortization

table was created without consideration of any of those disputes in the record. In fact, Miranda's calculation in his brief of how much he now believes the Diazes owed on the 1999 note as of the trial date ($323,059.61)—as reflected in his amortization table—differs significantly from the amount he claimed they owed when he testified at trial ($107,000). Accordingly, to the extent Miranda is asking us to take judicial notice of the results of the mathematical calculations in his amortization table or to construct our own amortization table, we decline to do so.

Because Miranda did not conclusively establish as a matter of law that the Diazes were in default on the 1999 note, the trial court did not err in denying Miranda's claim to rescind the vendor's lien and regain possession of the property.

Miranda's Issue One is overruled.

## V. WHETHER THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO SUPPORT THAT THE NOTE WAS PAID OFF

In Issue Two, Miranda contends the evidence presented at trial was legally and factually insufficient to support the trial court's determination that the 1999 note was paid off with the exception of the $1,509 excess payment Miranda paid to Bank of America. We agree that the evidence was legally insufficient to support this determination.

### A. Standard of review

When, as here, a party raises both legal and factual sufficiency, we must address the legal sufficiency point first. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981) (per curiam). We apply the same legal sufficiency or "no evidence" standard set forth above and will affirm the trial court's judgment if there is at least a scintilla of evidence to support the judgment, i.e., if there is sufficient evidence that would enable reasonable and fair-minded people to differ in their conclusions. *Flores*, 576 S.W.3d 782, 791. Because we find that the evidence was legally insufficient to support the trial court's determination that the note was paid in full, our analysis

stops there.

**B. Analysis**

In concluding that the note had been paid off, the trial court referred to Reinhart's October 2018 letter to Zenaida in which he stated that the balance on her loan was $39,000, and Zenaida's tendering of the $25,000 cashier's check to Trien in February 2020. Even assuming the validity of Reinhart's statement and assuming the Diazes were entitled to a credit for the $25,000 payment, this would leave $14,000 owing on the note. Taking into account the $4,800 in documented payments Zenaida made in the interim, a balance of $9,200 remains.

The only possible way the trial court could have determined that the 1999 note was paid off is if it found that Zenaida made $9,200 in cash payments to Trien between October 2018 and the date of trial. But at trial, Zenaida only testified that she made up to $50,000 in cash payments to Trien over the course of the 22 years she lived in the house prior to Miranda's purchase of the note, without specifying when any of those payments were made. She did not testify that she made any cash payments to Trien after she received Reinhart's October 2018 letter. Thus, although the trial court could have found that Zenaida was credible when she testified that she made up to $50,000 in cash payments to Trien over the course of 22 years to support its finding that Zenaida was not in default on the 1999 note, the evidence was not sufficient to support a finding that she paid the note in full prior to trial. Zenaida's general testimony that she made cash payments at unspecified times over the course of 22 years would give rise to any number of inferences as to when those payments were made, none of which were more probable than another. Because the trial court would have had to speculate that she made $9,200 of those payments after being notified that the balance on her loan was $39,000, the evidence was legally insufficient to support the trial court's conclusion that the 1999 note would be paid in full upon the Diazes making a payment of

31

$1,509 to Miranda. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997) (internal citations omitted) (recognizing that testimony that gives rise to "any number of inferences, none more probable than another," is legally insufficient to support the inference of a fact).

Miranda's Issue Two is sustained.

## VI. THE TRIAL COURT'S FAILURE TO ENTER FINDINGS OF FACT AND CONCLUSIONS OF LAW

In his third and final issue, Miranda contends the trial court committed "harmful error" by refusing his request for findings of fact and conclusions of law. We disagree.

### A. Applicable law

Texas Rule of Civil Procedure 296 gives parties the right to ask the trial court to prepare written findings of fact and conclusions of law following the entry of judgment in a case tried without a jury.[16] *Bluebonnet Fin. Assets v. Miller*, 324 S.W.3d 600, 601 (Tex. App.—El Paso 2009, no pet.) (citing Tex. R. Civ. P. 296). In turn, Rule 297 makes the trial court's duty to prepare such findings mandatory in response to a timely request. *Id*. at 601–02. (citing Tex. R. Civ. P. 297)[17]; *see also Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989) (recognizing that the court's duty to make findings under Rule 297 is "mandatory"). "A trial court's failure to respond to a timely request is presumed to be harmful error unless the appellate record

---

[16] Rule 296 provides, in part, "In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law . . . within twenty days after judgment is signed with the clerk of the court, who shall immediately call such request to the attention of the judge who tried the case." Tex. R. Civ. P. 296. The Diazes do not dispute that Miranda complied with the provisions of Rule 296.

[17] Rule 297 provides, in part, "Within twenty days after a timely request is filed, the court must send its findings of fact and conclusions of law to the parties as provided in Rule 21(f)(10)." Tex. R. Civ. P. 297. It further provides that if the court fails to do so, "the party making the request must, within thirty days after filing the original request, file with the clerk and serve on all other parties in accordance with Rule 21a a 'Notice of Past Due Findings of Fact and Conclusions of Law' which must be immediately called to the attention of the court by the clerk." *Id*. The Diazes do not dispute that Miranda complied with the provisions of Rule 297.

affirmatively shows that the complaining party has suffered no harm." *Bluebonnet Fin. Assets*, 324 S.W.3d at 602 (citing *Cherne Indus., Inc.*, 763 S.W.2d at 772).

### B. Analysis

While Miranda made a timely request for findings of fact and conclusions of law, the Diazes dispute that Miranda was harmed by the trial court's failure. The test for determining whether a party was harmed by the trial court's failure to enter findings is "whether the circumstances of the particular case would require an appellant to have to guess the reason or reasons that the trial judge has ruled against it." *Howe v. Howe*, 551 S.W.3d 236, 244 (Tex. App.—El Paso 2018, no pet.). However, "[i]f there is only a single ground of recovery or a single defense in the case," there can be no showing that the appellant has suffered harm "because he is not forced to guess the reasons for the trial court's judgment." *Bluebonnet Fin. Assets*, 324 S.W.3d at 603 (citing *Larry F. Smith, Inc. v. The Weber Co., Inc.*, 110 S.W.3d 611, 614 (Tex. App.—Dallas 2003, pet. denied)); *see also Ward v. Gallagher*, No. 08-22-00224-CV, 2023 WL 4244748, at *4 (Tex. App.—El Paso June 28, 2023, no pet.) (mem. op., not designated for publication) (recognizing same).

In his appellate briefing, Miranda maintains he was harmed by the trial court's judgment in general, repeating his belief that the trial court erred in denying his request to rescind his vendor's lien and contending he was harmed by the trial court's judgment because it meant that he in essence "lost his (admittedly risky) investment in the property." This, however, is not the standard for determining whether a trial court's failure to file findings of fact and conclusions of law caused any harm. Miranda does not argue that he was required to guess the basis of the trial court's judgment, nor does he otherwise explain how the trial court's failure in any way impacted his ability to raise his issues on appeal.

Accordingly, we conclude that Miranda has not established he was harmed by the trial court's failure to make findings of fact and conclusions of law.

Miranda's Issue Three is overruled.

## VII. CONCLUSION

We affirm the portion of the trial court's judgment denying Miranda's claim to rescind the lien and regain possession of the property. We reverse the remaining portion of the trial court's judgment in which it found that the Diazes made all payments on the Tenaha Home except $1,509; its order directing the Diazes to pay that amount to Miranda; and its finding that after such payment, "nothing further will be due and owing" on the home. [18] *See* Tex. R. App. P. 43.2 (c) (an appellate court may reverse the trial court's judgment in whole or in part and render the judgment that the trial court should have rendered).

LISA J. SOTO, Justice

May 22, 2025

Before Rodriguez, S.J., Palafox and Soto, JJ.
Palafox, J., concurring and dissenting in part

---

[18] As the Diazes neither filed a notice of appeal challenging the trial court's failure to address their counterclaim, nor complained about the failure on appeal, we do not consider the counterclaim as a basis for remanding the case to the trial court for a new trial. Instead, we only address the judgment in the context of the affirmative defense of payment. *Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 37 (Tex. 2008) (recognizing that Rule 95 only applies to situations in which a defendant has plead payment as an affirmative defense but does not apply to "payment as an affirmative *claim*"). An affirmative defense only "seeks to 'establish an independent reason why the plaintiff should not recover.'" *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 631 (Tex. App.—Dallas 2020, no pet.) (quoting *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 212 (Tex. 1996)). An affirmative defense "does not advance the claims of the party asserting it." *Izen v. Laine*, 614 S.W.3d 775, 790–91 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).